# EXHIBIT I

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

| | |
|---|---|
| MARTHILDE BRZYCKI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 2:18-cv-01582-MJP |
| | ) |
| HARBORVIEW MEDICAL CENTER and | ) |
| UNIVERSITY OF WASHINGTON, | ) |
| | ) |
| Defendants. | ) |

_____

DEPOSITION UPON ORAL EXAMINATION

OF

KIM FRANCIS
_____

705 Second Avenue, Suite 1200

Seattle, Washington

DATE:  Thursday, October 17, 2019

REPORTED BY:  Donald W. McKay, RMR, CRR, CCR 3237

```
 1     A.   My manager knows that I'm not at work.
 2     Q.   Okay.  But you didn't talk about what you would
 3  be saying in the deposition or anything like that?
 4     A.   Oh, no.
 5     Q.   Did you talk with Kathy Hare about your
 6  deposition?
 7     A.   She also knows that I have one.
 8     Q.   Okay.  Fair enough.
 9          Okay.  Are you currently employed by
10  UW Medicine?
11     A.   Yes.
12     Q.   What is your current title?
13     A.   I am a leave specialist lead.
14     Q.   What are your responsibilities as leave
15  specialist lead?
16     A.   The leave specialist's role is to review
17  incoming requests for medical leave, approve or deny
18  them based on regulations and university policy,
19  correspondence with employees, health care providers,
20  department management, as part of that process, and also
21  do the same for disability accommodations as well.
22          And as the lead, I'm responsible for onboarding
23  any new member of our team and other duties as assigned,
24  which would be making sure that the letter -- you know,
25  templates that we use are up to date and according to
```

Kim Francis                                                    October 17, 2019

Page 51

1  while you acted as leave consultant.  Is that correct?
2      A.  As HR consultant, yes.
3      Q.  Okay.  Was Debbie Reandeau already an employee
4  of Harborview Human Resources before she began filling
5  in for you as leave specialist?
6      A.  No.
7      Q.  No?  So was she a new employee?
8      A.  Yes.
9      Q.  About when did she start?
10     A.  She would have started in November of 2016,
11 roughly.
12     Q.  You said Debbie would have received this because
13 she was the leave specialist.  Correct?
14     A.  Correct.
15     Q.  So as a leave specialist -- what does the leave
16 specialist do -- in 2016, 2017 -- when the leave
17 specialist receives a request for an accommodation?
18     A.  The first step would be to evaluate whether or
19 not the request is clear and whether or not the medical
20 documentation received provides a medical reason for
21 that request.  If that all checks out, then you would
22 reach out to the department to ask if they can make that
23 accommodation.
24         MS. FIX:  Okay.
25         (Exhibit 29 marked for identification.)

```
 1            MS. FIX:  Seth, are you ready to go?
 2            MR. BERNTSEN:  Go ahead.
 3            (Exhibit 31 marked for identification.)
 4    BY MS. FIX:
 5        Q.  Take a moment to look at this document and I'll
 6    ask you some questions.
 7        A.  Okay.
 8        Q.  Okay.  Do you recognize the document in
 9    Exhibit 31?
10        A.  Yes.
11        Q.  What is the document in Exhibit 31?
12        A.  It is a Family and Medical Leave Health Care
13    Provider Certification.
14        Q.  So this would be the HCPS that you referred to
15    in Exhibit 25?
16        A.  Correct.
17        Q.  And based on the stamp that is near the bottom
18    of the page, Human Resources received this on June 27,
19    2017.  Correct?
20        A.  Correct.
21        Q.  And at that time, had you returned to working as
22    leave specialist?
23        A.  I believe so.
24        Q.  So did you receive this document when it came
25    into HR?
```

1      A.   I would believe, yes.
2      Q.   So look at the second page of this exhibit.
3  About two-thirds of the way down, it says,
4  "Reduced/Modified Work Schedule."  Correct?
5      A.   Correct.
6      Q.   It says, "Patient can return to work 20 hours
7  per week x two months."  Correct?
8      A.   Correct.
9      Q.   So when HR receives a request such as this
10  part-time return to work, what does HR do?
11      A.   It depends.
12      Q.   Well, what do you do when you receive that
13  request?
14      A.   Well, it depends whether the person qualifies
15  for FMLA or not.
16      Q.   Okay.
17      A.   So if they qualify for FMLA, we would approve a
18  reduced schedule leave where the other 20 hours or the
19  other remainder of their FTE would be FMLA leave.  If
20  they don't qualify for FMLA, then this would be treated
21  like an accommodation request, and you would ask the
22  department if they could accommodate the reduced
23  schedule.
24      Q.   So if we look back at Exhibit 25, there is a row
25  in the table dated June 27, 2017.  Correct?

```
 1      A.   Correct.
 2      Q.   So does this indicate whether this part-time
 3   return to work was approved?
 4      A.   This would indicate that there was a leave
 5   approval for that time frame, yes.
 6      Q.   For reduced scheduling.
 7      A.   Correct.
 8           (Exhibit 32 marked for identification.)
 9   BY MS. FIX:
10      Q.   Take a look at Exhibit 32 and let me know when
11   you're ready to answer.
12      A.   Okay.
13      Q.   Exhibit 32 is an e-mail thread between you and
14   Tricia Roland.  Correct?
15      A.   Correct.
16      Q.   What was the purpose of this e-mail discussion?
17      A.   It was asking if the department could
18   accommodate the reduced schedule.
19      Q.   Did you have any discussion with Ms. Roland
20   about the reduced schedule?
21      A.   Other than the e-mail string?
22      Q.   (Nods head).
23      A.   I don't recall.  I don't think so.
24      Q.   Do you remember whether Ms. Roland provided you
25   with a proposed reduced schedule for Ms. Brzycki after
```

```
 1    you sent her this e-mail?
 2        A.   Yes.
 3        Q.   Did she send it to you for your review or did
 4    she send you a final version?
 5        A.   I believe it was a final version.
 6        Q.   Do you remember -- did you and Ms. Roland have
 7    any back and forth with the proposed schedule?
 8        A.   I believe we did, because the return to work
 9    date was around a holiday.
10        Q.   Do you remember whether that -- that discussion
11    about the return to work date, was that in e-mails or in
12    a call or in person?
13        A.   I don't recall which.
14        Q.   Was the issue of the return to work date
15    resolved?
16        A.   I believe so.
17             (Exhibit 33 marked for identification.)
18    BY MS. FIX:
19        Q.   Are you ready?
20        A.   I'm ready.
21        Q.   Do you recognize this e-mail?
22        A.   Yes.
23        Q.   And what is this e-mail?
24        A.   It is the proposed reduced schedule -- Tricia
25    had documented it, I guess, in PowerPoint, I'm not
```

Page 60

1  sure -- outlining, the first part, around the 4th of
2  July holiday, and then going forward, a second part.
3      Q.  Does this refresh your memory about whether you
4  had reviewed the proposed return to work schedule before
5  she sent it to Ms. Brzycki?
6      A.  I don't think I did.
7      Q.  Now, turn to the second page of the exhibit.  So
8  the second page is a table headed, "First Week Back."
9      A.  Correct.
10     Q.  And the accommodation that Ms. Brzycki had asked
11 for or that her physician had asked for was a 20-hour
12 return to work schedule.
13     A.  Correct.
14     Q.  Twenty hours per week.
15         And looking at the first week, how many hours
16 does this schedule include?
17         MR. BERNTSEN:  Object to form.  Calls for
18 speculation.  Lacks foundation.
19         THE WITNESS:  Do I answer?
20 BY MS. FIX:
21     Q.  If you can.
22     A.  Okay.  Can I have a pen to do some math?
23     Q.  Sure.
24     A.  I'm not sure how to read the top portion on
25 Friday.

```
 1      Q.   Okay.  Fair enough.
 2      A.   But it looks like roughly five hours a day.
 3      Q.   Okay.  Fair enough.
 4           And then looking at the second page of the
 5   document --
 6      A.   Um-hmm.
 7      Q.   -- do you know what this second page is meant to
 8   represent?
 9      A.   It's her work schedule going forward to meet the
10   20 hours per week.
11           (Exhibit 34 marked for identification.)
12   BY MS. FIX:
13      Q.   Okay.  Take a look at this and let me know when
14   you're ready.
15      A.   Okay.
16      Q.   Have you seen this document before?
17      A.   No.
18      Q.   Looking at the bottom of the first page, there
19   is an e-mail on June 30, 2017 from mjeanty, which is
20   Mattie Brzycki's e-mail address.  Correct?
21      A.   Yes.
22      Q.   Had you seen this portion of the e-mail before?
23      A.   Are you talking about this page?
24      Q.   On page one, starting at the bottom, where it
25   says, "On June 30, 2017," and then it continues onto the
```

 1    second page.
 2        A.   I don't believe so.
 3        Q.   So looking back at Exhibit 33 and the schedule
 4    that's attached starting on page two, you testified
 5    before that a reduced schedule can be offered as an
 6    accommodation for a disability.  Correct?
 7        A.   Correct.
 8        Q.   So do you consider this schedule, then, an
 9    accommodation for Ms. Brzycki's disability?
10        A.   Correct.
11        Q.   Going back to Exhibit 34, in the second full
12    paragraph of Ms. Roland's e-mail --
13        A.   Right.
14        Q.   -- she writes, "This schedule/workflow is not up
15    for negotiation..."
16             Is that consistent with how the university
17    handles disability accommodations?
18        A.   No.
19        Q.   And why not?
20        A.   Because at any point in time, the department or
21    the employee could re-engage in the process.
22        Q.   Tell me what you mean by that.
23        A.   If I had received this information, I would have
24    re-engaged in the disability accommodation process and
25    seen if there were other modifications to that schedule

1  that would have worked for both the employee and/or the
2  department.
3      Q.  Are you aware of whether that happened in this
4  case?
5      A.  It did not.
6          MS. FIX:  Seth, if you want a lunch break, this
7  might be a good point, because I think the next chunk is
8  going to take a while.
9          THE REPORTER:  Do you want to go off the record
10 for this?
11         MS. FIX:  Please.  I'm sorry.
12         (Discussion off the record.)
13         MS. FIX:  We can go back on the record.  Thank
14 you.
15 BY MS. FIX:
16     Q.  Can you look back at Exhibit 25, which is the
17 timeline that you put together.
18     A.  Okay.
19     Q.  In the table, there is a row for 7/7/17, which
20 says, "Phone call from Ms. Brzycki about accommodation
21 request in Feb."
22     A.  Um-hmm.
23     Q.  Was that a phone call that you had with
24 Ms. Brzycki?
25     A.  Yes.

```
                                                              Page 104
 1                       C E R T I F I C A T E

 2
     STATE OF WASHINGTON    )
 3                          ) ss
     COUNTY OF KING         )
 4

 5           I, the undersigned Washington Certified Court
     Reporter, hereby certify:
 6
             That the foregoing deposition upon oral examination
 7   of the witness named herein was taken stenographically
     before me and transcribed under my direction;
 8
             That the witness was duly sworn by me pursuant to
 9   RCW 5.28.010 to testify truthfully;

10           That the transcript of the deposition is a full,
     true and correct transcript to the best of my ability;
11
             That I am neither an attorney for, nor a relative
12   or employee of any of the parties to the action or any
     attorney or counsel employed by the parties hereto, nor
13   financially interested in its outcome.

14           I further certify that in accordance with CR 30(e),
     the witness was given the opportunity to examine, read,
15   and sign the deposition, within 30 days upon its
     completion and submission, unless waiver of signature was
16   indicated in the record.

17

18
                     _____
19

20                   Donald W. McKay, RMR, CRR
                     Washington Certified Court Reporter No. 3237
21                   License effective until: 07/02/2020

22

23

24

25
```