# EXHIBIT L

Page 1

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

MARTHILDE BRZYCKI,            )
     Plaintiff,              )
  vs.                          ) No. 2:18-cv-01582-MJP
HARBORVIEW MEDICAL CENTER     )
and UNIVERSITY OF             )
WASHINGTON,                   )
     Defendants.             )

_____

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF

TRICIA O'DONOHUE

_____

10:01 a.m.

October 31, 2019

705 Second Ave

Seattle, Washington

REPORTED BY: Margaret Walkky, CCR, RPR, RMR, CRR

Court Reporter, License No. 2540

Page 6

```
 1    TRICIA O'DONOHUE,        witness herein, having been
 2                             first duly sworn on oath,
 3                             was examined and testified
 4                             as follows:
 5
 6                    E X A M I N A T I O N
 7    BY MS. FIX:
 8         Q.   Good morning, Ms. O'Donohue.
 9         A.   Good morning.
10         Q.   Would you please state your name and
11    spell your name for the record.
12         A.   Sure.  Tricia O'Donohue, T-R-I-C-I-A,
13    last name O-'-D-O-N-O-H-U-E.
14         Q.   And during 2016, 2017, which is the
15    period of time we'll be talking about today, your
16    last name was Roland, correct?
17         A.   Correct.
18         Q.   Okay, and why did your name change?
19         A.   I got divorced.
20         Q.   What was your husband's name?
21         A.   Francknel, F-R-A-N-C-K-N-E-L.  Last
22    name is Roland, R-O-L-A-N-D.
23         Q.   Could you please state your address.
24         A.   ███████████████████████████████
25    ███████████████████████████
```

Page 22

1    or after I left, they ended up creating a Stroke
2    Program manager position that I would say is very
3    similar.
4              At Swedish, the stroke coordinator was
5    sort of an in-between between the stroke resource
6    nurse at Harborview and the Stroke Program manager at
7    Harborview.
8         Q.   Did you have direct reports as stroke
9    clinical operations coordinator?
10        A.   No.
11        Q.   And then going down this resume, you
12   were a travel nurse for a while?
13        A.   Correct.
14        Q.   Okay.
15        A.   Long time on and off.
16        Q.   And then from October 2011 to May 2012,
17   you worked at Partners in Health in St. Marc, Haiti?
18        A.   Yes.
19        Q.   Can you tell me about that experience?
20        A.   Sure.  Is there something specific I
21   should look at or are you looking the work I was
22   doing?
23        Q.   The work you were doing, let's start
24   with the work you were doing, yes.  Thank you.
25        A.   Okay.  So I worked in St. Marc.  I

1   spent most of my time at the hospital in St. Marc
2   doing a lot of education, again, process improvement.
3   I was project manager for restructure of the
4   emergency department at that hospital.  We
5   implemented a triage system that previously was not
6   in place.
7              I was also mentor to the Haitian
8   nursing leadership team that worked throughout the
9   country as part of Partners in Health.
10             And I would say those were my key -- I
11  did -- I taught some classes as well, like a BLS
12  class.
13        Q.   What's BLS?
14        A.   Basic life support, CPR, basically.
15        Q.   And so what is Partners in Health?
16        A.   Partners in Health is an NGO that is --
17  their home base is in Boston, but they have offices
18  many places of the world, and one of their big sites
19  and I think one of they originating sites is in Haiti
20  where they have ten sites across the country, and
21  basically, it's all about healthcare and getting
22  patients the care they need.
23        Q.   Okay.  How did you come to work for
24  Partners in Health?
25        A.   I was getting my master's in public

```
 1   employed there were Haitian, but again, I wasn't the
 2   only one that would randomly decide they wanted to
 3   cook something, so then other people would.
 4   Sometimes they were local, sometimes they were
 5   American.
 6            Q.   So your husband was Haitian, right?
 7            A.   Yes.
 8            Q.   Did you meet him during this period of
 9   time?
10            A.   No.
11            Q.   How did you meet him?
12            A.   I met him in 2005 when I did a medical
13   trip to Haiti, St. Louis du Nord.  I'm sorry, I
14   couldn't think where it was.  And then I met him
15   then.
16            Q.   How many times did you -- so you went
17   for the Partners in Health employment and to Haiti --
18   let me back up.  I apologize.
19                 So you went to Haiti for the Partners
20   in Health employment and for a 2015 medical trip.
21   Were there other trips that you took to Haiti up
22   until 2012?
23            A.   You mentioned 2015?
24            Q.   I apologize.
25            A.   I'm sorry, I'm confused.
```

```
 1          Q.   Sure.
 2               Was there a date when you felt that you
 3    had like launched an investigation?
 4          A.   I would say that that would be the
 5    first investigatory interview we did with Mattie.
 6          Q.   And had you decided by November 1 to
 7    have an investigatory interview with Mattie?
 8          A.   I don't recall.  I was obviously
 9    meeting with Nola and expressing the concerns that I
10    had regarding her productivity and time card, but
11    beyond that, I'm not sure.
12               MS. FIX:  This might be a good time for
13    lunch.
14               MR. BERNTSEN:  Sure.
15               THE VIDEOGRAPHER:  We're going off the
16    record at 12:21 p.m.
17               (Lunch recess from 12:21 to 1:33 p.m.)
18               THE VIDEOGRAPHER:  We're back on the
19    record at 1:33 p.m.
20    BY MS. FIX:
21          Q.   So just a reminder now that we're back
22    from lunch, that you are still under oath from the
23    oath you took this morning.
24          A.   Okay.
25          Q.   Do you understand that?
```

Page 165

```
 1            Q.   Did you learn about that in May 2017?
 2            A.   I think I have an email from April of
 3    2017 from Nola with the UCIRO website.
 4            Q.   Tell me more about what you mean
 5    by "with the UCIRO website."
 6            A.   So you're talking about the EEOC
 7    charge?
 8            Q.   Yes.
 9            A.   I'm sorry, I'm talking about the UCIRO
10    charge.
11            Q.   Okay.
12            A.   The EEOC, I -- yes, I would guess it
13    was May.  I'm not -- without looking at the document,
14    I can't say for sure.
15            Q.   You learned of a UCIRO complaint in
16    April 2017?
17            A.   Correct.  I'm sorry, I was confusing
18    the two.
19            Q.   When you looked at the UCIRO website,
20    what did you see there?
21            A.   I don't recall.  I think it explains
22    what their office does.
23            Q.   Could you go to Exhibit-32 in your
24    notebook and if you'd review this and let me know
25    when you're ready to discuss it.
```

```
 1        A.    Okay.
 2        Q.    Do you recognize this document?
 3        A.    Yes.
 4        Q.    What is this document?
 5        A.    This is Kim Francis alerting me to
 6   Mattie's FMLA paperwork to come back to work at a
 7   reduced schedule.
 8        Q.    And she emailed you on June 28, --
 9        A.    Yes.
10        Q.    -- 2017?
11        A.    June 28, 2017, correct.
12              (Exhibit-97 marked.)
13        Q.    Would you review Exhibit-97 and let me
14   know when you're ready to discuss it.
15        A.    Sure.
16              Okay.
17        Q.    Do recognize this document?
18        A.    Yes.
19        Q.    What is this document?
20        A.    This was Mattie's reduced schedule that
21   I sent to her, and then there's a series of emails
22   where Mattie's saying she didn't get the attachment
23   but David is saying they were attached, and then I
24   attached them again.
25        Q.    Are the last two pages of the document
```

Page 167

```
 1   the reduced schedule?
 2            A.   Correct.
 3            Q.   What process did you use to develop the
 4   reduced schedule?
 5            A.   Well, looking at the clinic needs, the
 6   needs of the department, that was how I came to this
 7   schedule.  And I also reviewed this with
 8   Dr. Tirschwell.  There may have been others, I'm not
 9   sure.
10            Q.   Did you review it with Kim Francis?
11            A.   I imagine I forwarded it to her, but
12   I'm not sure without having the document right in
13   front of me.  So I'm not sure.
14            Q.   And then you copy a whole bunch of
15   people on the CC line of your email.  Why did you
16   copy each of these people?
17            A.   Can you tell me where --
18            Q.   Oh, sorry.
19            A.   Are you referring to the bottom of
20   page 1?
21            Q.   First page of 97, I'm sorry, you're
22   right.  First page of 97, top email, there's a CC
23   line?
24            A.   Yes, to David and Mattie, okay.
25            Q.   Yeah.
```

```
 1          A.   Right.  I can tell you that I included
 2   Kim because this was her reduced schedule to meet her
 3   accommodation, and then it became -- I mean, Nola
 4   Kathy and Kelly I was trying to keep looped into all
 5   conversations that were happening with Mattie.
 6          Q.   So Kim Francis was included because she
 7   was the leave specialist, right?
 8          A.   Correct.
 9          Q.   And the leave specialist is responsible
10   for managing accommodations?
11          A.   Accommodation and the FMLA.
12               (Exhibit-98 marked.)
13          Q.   Review this and let me know when you're
14   ready to talk about it.
15          A.   Okay.
16          Q.   Do you recognize this document?
17          A.   Yup.
18          Q.   What's this document?
19          A.   Mattie's response to my initial email
20   to her with the reduced schedule.
21          Q.   What was your reaction to Mattie's
22   email regarding the reduced schedule?
23          A.   Well, a couple of things.  On Friday
24   7-7, she says I left out her 30-minute lunch break,
25   which I did not.  7-7 lunch is there from 1:00 to
```

1   2:00. I did not define the 15-minute breaks
2   initially.
3               It went without saying in my mind, but
4   she says, "My notes have been completed in a timely
5   manner per hospital policy since hired with a hundred
6   percent compliance for billing prior to you changing
7   my workflow."
8               So in regards to that, the hundred
9   percent compliance for billing was related to 10
10  charts that were billed at a hundred percent, but it
11  really has nothing to do with the time that she was
12  completing her notes.
13              I don't know what she was referring to
14  when she says, "I will no longer be able to add any
15  add-ons like I used to on my clinic days - due to the
16  schedule restrictions and recent disruption to my
17  workflow."
18          Q.   That's in the fifth paragraph?
19          A.   Correct.
20              And then she proceeds to dictate to me
21  what her schedule should be, which my initial
22  reaction is, well, that's not what meets the needs of
23  the department. And yeah, that was it.
24          Q.   You felt her request to see fewer than
25  six patients on the clinic day was unreasonable?

 1          A.   Yes, and she goes -- hang on one
 2   second, let me just read something here.  Oh, yeah,
 3   fifth paragraph down, she says, "more than my usual
 4   load at this time," and that was an inaccurate
 5   statement.
 6          Q.   How is it inaccurate?
 7          A.   It was actually less than the amount of
 8   patients that she had scheduled.
 9          Q.   Can you explain that a little bit?
10          A.   Sure.  The three patients that she has
11   scheduled, "you mentioned three cases on Fridays," so
12   she always had more than three patients booked.  Now,
13   whether they showed up was whole different story.
14          Q.   Sure, but she had -- your proposal had
15   six patients on Tuesday, right?
16          A.   Correct.
17          Q.   Was six patients more than her usual
18   load?
19          A.   I think that was in line with what she
20   had previously booked, but I would have to go back
21   and check the schedule to know for sure.
22          Q.   It was what she previously booked when
23   she worked full-time?
24          A.   Correct, because her job encompassed
25   more than just seeing patients in clinic.

```
 1            Q.    Then she asked for advance warning
 2     prior to meetings about you and Kelly.  What was your
 3     reaction to that request?
 4            A.    I touched base with Nola because I
 5     wasn't sure if that was in line with the union
 6     contract are not, that every time I was going to
 7     engage with her, I had to have a union rep there.  So
 8     Nola clarified for me.
 9            Q.    What did she say?
10            A.    What is in one of the emails, that if
11     there was disciplinary action, certainly she was
12     welcome to have a union rep there.  But as part of
13     day-to-day operations and conversations, that I did
14     not need to have a union rep or she did not need to
15     have a union rep to partake in those day-to-day
16     operation conversations.
17            Q.    That is under the CBA, that's your
18     understanding, that the CBA says she doesn't have to
19     have a union representative for everyday
20     conversations, correct?
21            A.    The collective bargaining agreement?
22            Q.    Yeah.
23            A.    Yeah, I would trust Nola's opinion in
24     that to know what was and was not allowed.
25            Q.    Could her request to have a union
```

```
 1   member present during meetings with you and Kelly be
 2   interpreted as a request for accommodation?
 3                MR. BERNTSEN:  Object to the form to
 4   the extent it calls for a legal conclusion.
 5        A.   I don't know what makes a legal
 6   accommodation or not.  That's certainly not how I
 7   looked at this.
 8        Q.   How did you look at it?
 9        A.   That she was wanting another union rep
10   there during any conversation that I had with her,
11   any meeting that I had with her and Kelly.  Actually,
12   she says, I'm sorry, "any private meeting with you,
13   Kelly, and any other member of management."
14        Q.   What about the request for advance
15   warning?
16                MR. BERNTSEN:  Object to form.  It's
17   not a complete question.  It's a statement.
18        Q.   Okay.  So she asks for advance warning.
19   Was a request for an advance warning for a meeting
20   with you or Kelly an unreasonable request?
21        A.   In my opinion, yes, I think so, because
22   it's not in line with day-to-day operations and
23   needs.  If I had a patient care question, there may
24   not be time to give advance warning.  I mean, there's
25   other examples too.
```

Page 173

1           Q.    Mattie's email went to the same group
2    of people that your June 30 email in Exhibit-97 went
3    to, correct?
4           A.    Yes, it appears that way.
5                 (Exhibit-99 marked.)
6           Q.    Take a look at the document and let me
7    know when you're ready.
8           A.    Okay.  So page 2 on is the same stuff
9    that we just reviewed?
10          Q.    Yeah, okay.
11          A.    Sorry, give me one minute.
12          Q.    I'm sorry.
13          A.    Okay.
14          Q.    Thank you.
15          A.    Okay.
16          Q.    So your response to Mattie's email --
17   actually, let me back up.
18                Do you recognize this document?
19          A.    Yes.
20          Q.    And what is it?
21          A.    It's an email from me to Mattie
22   responding to her previous email that we just
23   discussed.
24          Q.    In the CC line, you didn't include Kim
25   Francis?

```
 1              A.    No.
 2              Q.    And why is that?
 3              A.    To the best I can recall, Nola felt
 4   like at this point we should remove Kim because it
 5   was no longer about her accommodation.  This was
 6   about work performance.
 7              Q.    Did she explain why that was her
 8   feeling?
 9              A.    Well, we had met the accommodation with
10   the modified schedule, and going back to Mattie's
11   previous email, this was just more of the pushback
12   that was how Mattie engaged in conversations with me.
13              Q.    When you write in the second paragraph,
14   "This schedule/workflow is not up for negotiation,"
15   what did you mean by that?
16              A.    Yup.  Well, just that, that we needed
17   to give this a shot.
18                    I go on further to say, "though as
19   ever, if you run into any challenges in meeting the
20   work expectations you should come to me right away so
21   we can engage" -- sorry, I'm talking too fast --
22   "engage in a problem-solving discussion to review
23   workflow, priorities and strategies."
24                    So it was my intent that we needed to
25   give this schedule a shot and that we were meeting
```

1   her accommodation, and that if it wasn't working, we
2   would revisit with her.
3           Q.   Did you discuss this response with Kim
4   Francis before you sent it?
5           A.   I don't know if I discussed it with
6   Kim, but definitely Nola.
7           Q.   So Mattie -- so let's look at
8   Exhibit-97 and the last two pages of that document.
9           A.   Okay.
10          Q.   So Mattie's first Tuesday clinic would
11  have been on July 11, correct?
12          A.   Yes, because July 4 was a holiday.
13          Q.   And then which means we would -- she
14  would follow the 20-hour schedule on the second page
15  of your PowerPoint, correct?
16          A.   Correct.
17          Q.   Was she in fact successful in seeing
18  six patients in five hours?
19          A.   I do not recall without looking at
20  backup notes.
21          Q.   Do you recall whether Mattie went out
22  on medical leave again shortly after the July 11
23  workday?
24          A.   Yes, I believe it was -- I mean, over
25  the course of that year, she wasn't there a whole

```
 1                  C E R T I F I C A T E

 2

 3   STATE OF WASHINGTON    )ss.

 4   COUNTY OF KING         )

 5

 6

 7   I, Margaret Walkky, the undersigned Registered Merit
     Reporter and an officer of the Court for the State of
 8   Washington, hereby certify that the foregoing
     deposition upon oral examination of TRICIA O'DONOHUE
 9   was taken before me on October 31, 2019 and
     transcribed under my direction;
10
     That the witness was duly sworn by me pursuant to RCW
11   5.28.010 to testify truthfully; that the transcript
     of the deposition is a full, true, and correct
12   transcript to the best of my ability; that I am
     neither attorney for, nor a relative or employee of,
13   any of the parties to the action or any attorney or
     counsel employed by the parties hereto, nor
14   financially interested in its outcome;

15   I further certify that in accordance with CR 30(e),
     the witness was given the opportunity to examine,
16   read, and sign the deposition, within 30 days, upon
     its completion and submission, unless waiver of
17   signature was indicated in the record.

18   IN WITNESS WHEREOF, I have hereunto set my hand and
     seal this date: November 7, 2019.
19

20

21

22            ..............................
              Margaret Walkky, Registered Merit Reporter
23            Certified Court Reporter No. 2540 License
              expires July 18, 2020
24

25
```