THE HONORABLE MARSHA J. PECHMAN

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| MARTHILDE BRZYCKI,<br><br>            Plaintiff,<br><br>v.<br><br>HARBORVIEW MEDICAL CENTER and<br>UNIVERSITY OF WASHINGTON,<br><br>            Defendants. | CASE NO. 2:18-cv-01582-MJP<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**NOTING DATE: DECEMBER 20, 2019**<br><br>**ORAL ARGUMENT REQUESTED** |

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 0
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104–1798 ~ (206) 682-6711

## I.     INTRODUCTION

Plaintiff Marthilde Brzycki opposes the motion for summary judgment (Dkt. # 28) filed by Defendants Harborview Medical Center ("Harborview") and the University of Washington. Until Defendants hired Tricia Roland as Brzycki's manager, Brzycki had received only positive feedback about her work from the physicians she worked with and the patients she served. Roland, who had lived in Brzycki's native country of Haiti, arrived at Harborview with expectations that Brzycki would behave consistently with the women she knew and worked with in Haiti. When Brzycki did not conform to this stereotype, Roland launched an investigation that led to imposing on Brzycki the most serious level of discipline short of termination. She also refused to engage in an interactive process to develop a reasonable accommodation for Brzycki's anxiety and, along with other managers, retaliated against Brzycki for making complaints of discrimination. The Court should deny Defendants' motion and allow this case to proceed to trial.

## II.     FACTUAL BACKGROUND

### A. Brzycki's employment at the Harborview Stroke Center.

Brzycki is a native of Haiti. Declaration of Marthilde Brzycki ("Brzycki Decl.") ¶ 2. She moved to the U.S. when she was eleven years old and continues to speak with a strong Haitian accent. *Id.* Brzycki began working at Harborview Medical Center in 2011 as a part-time/per diem Registered Nurse ("RN"). *Id.* ¶ 3. She received all "distinguished" and "successful" marks on the one performance review she received while she was an RN. Declaration of Christie J. Fix ("Fix Decl.") Ex. A.

After receiving her master's degree and her Advanced Registered Nurse Practitioner ("ARNP") license, Brzycki began working as a full-time hourly Registered Nurse 2 in Harborview's Stroke Center in November 2014. Brzycki Decl. ¶ 3. She became a full-time Stroke Health Care Specialist ("HCS") in January 2015, after Harborview approved her ARNP privileges. *Id.* Based on the language of her offer letter, Brzycki understood that she was an exempt salaried employee. *Compare* Fix Decl. Ex. B (indicating that Brzycki would receive a

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 1
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

monthly salary) *with* Fix Decl. Ex. C (RN2 offer letter, indicating an hourly pay rate). Brzycki was the only Black and Haitian-American employee working in the Stroke Center and was one of very few Black employees working with stroke patients at Harborview. Brzycki Decl. ¶ 6.

As Brzycki quickly learned, the Stroke Center had a history of patient complaints, high staff turnover, and long wait times for patients to receive follow-up care after being discharged from the hospital. *Id.* To address these concerns, she developed and implemented algorithms to improve patient care. *Id.* She received positive feedback verbally and in email from the neurologists with whom she worked, in addition to many "Wow Cards" from patients thanking her for her high-quality care. *Id.* ¶ 7.

**B. Brzycki's first discrimination complaint.**

Brzycki's first year and a half at the Stroke Center were tumultuous due to the departure, in quick succession, of two Stroke Center Program Managers. The first Stroke Program Manager for whom Brzycki worked was Vicki Johnson. Brzycki Decl. ¶ 8. Brzycki was not provided a formal job description when she began working as the Stroke HCS. *Id.* ¶ 4. Brzycki learned her responsibilities by shadowing Johnson, who had been performing both the Stroke Program Manager and Stroke HCS roles before Brzycki was hired. *Id.* ¶ 8. Johnson trained Brzycki on how to complete chart notes by giving her a template to use as a guide. *Id.* She instructed Brzycki to provide plenty of detail because the notes were meant for the patient's primary care doctors, consulting specialists, and rehabilitation facilities or nursing homes. *Id.* Johnson also encouraged Brzycki to prepare for patient visits by reviewing records at home over the weekend; she gave Brzycki a USB drive on which she could save patient information for when she worked at home. *Id.*

Before long, Brzycki observed Johnson and Stroke Resource Nurse Dawn Drury making racially charged comments about minority staff members and patients. *Id.* ¶ 9. In August 2015, Brzycki complained to Johnson's manager, Assistant Administrator for Patient Care Services Kathy Hare, about Johnson's conduct. Brzycki informed Hare that Johnson had used racially insensitive language to describe employees of color. *Id.* Brzycki also described

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 2
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

concerns about Johnson's management skills and communication style.[1] Hare assigned Human Resources Consultant Nola Balch to investigate Brzycki's complaint. Balch Decl. (Dkt. # 31) ¶ 4. Brzycki also complained to the University of Washington's University Complaint Investigation and Resolution Office ("UCIRO"). Aleks Decl. (Dkt. # 37) Ex. A.[2] Although Balch concluded that Johnson had not engaged in a hostile work environment, she did find deficiencies in Johnson's leadership skills. Balch Decl. ¶ 9. Johnson went on leave in December 2015 and never returned to work. Hare Decl. ¶ 13.

After the 2015 investigation, Hare asked Abby Tesfamariam to assess the Stroke Center. Hare Decl. (Dkt. # 30) ¶ 12. Tesfamariam noted that Johnson had concerns about Brzycki's documentation practices and efficiency. Id. Ex. A. She also made findings regarding Brzycki's rounding practices and coordination with physicians and nurses. Id. None of Brzycki's managers met with Brzycki to discuss the concerns identified in Tesfamariam's report, nor did they put anything in place to notify Brzycki of the concerns or help her address them. Brzycki Decl. ¶ 12.[3]

After Johnson left, Miryah Hibbard served as an Interim Stroke Program Manager while

---

[1] Brzycki viewed the racial insensitivity complaint and her complaint about management style as two separate issues. Her "Challenges in the Stroke Center" document, Balch Decl. (Dkt. # 31) Ex. A, focused on the management concerns. Brzycki Decl. ¶ 9.

[2] Brzycki withdrew the UCIRO complaint after Hare told her that she and Balch would investigate the complaint she made to Hare. Brzycki Decl. ¶ 10.

[3] Tesfamariam also noted that Drury reviewed patient charts in the mornings on the train. Hare Decl. Ex. A at UWMB006014. Paananen, too, noted in her August 25 email that the Stroke Resource Nurse worked remotely during her morning commute. Fix Decl Ex. D. Tesfamariam and Paananen thus corroborate Brzycki's assertion that Johnson encouraged her employees to work offsite.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 3
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

Harborview sought a full-time replacement. *Id.* ¶ 13. Although Hibbard made efforts to better define Brzycki's job responsibilities, Hibbard was often absent from work and she, too, failed to provide a job description or clear scope of duties for Brzycki. *Id.*[4] Hibbard gave Brzycki positive feedback and discussed with her the possibility of transitioning to the Stroke Program Manager role when Hibbard returned to her previous position at Harborview. *Id.* ¶ 15. By July 2016, Hibbard, too, had separated from Harborview. Hare Decl. ¶ 14.

Hare then stepped in to manage the team. Contrary to Hare's recollection, Hare did not instruct Brzycki not to work off-site or off-the-clock. Brzycki Decl. ¶ 17. Although Brzycki overheard Hare telling then-per-diem Stroke Resource Nurse Ryan Huffman not to work off the clock, Brzycki did not believe that Hare's instructions applied to her because Brzycki understood herself to be a salaried employee. *Id.*

It is a University expectation that all employees will receive a yearly performance evaluation. Fix Decl. Ex. Q ("Hare Dep.") at 23:14-24:4.[5] Although Brzycki had started working as a Health Care Specialist in January 2015, she still had not received any reviews by July 2016. Brzycki Decl. ¶ 18. Eager for feedback on her job performance, Brzycki asked Hare to conduct a performance review and identified colleagues to participate in the review. *Id.*; Fix Decl. Ex. E. Despite these requests, however, Brzycki did not receive a single performance review during her time working in the Stroke Center. Brzycki Decl. ¶ 18.

## C.   Tricia Roland's arrival at Harborview.

In August 2016, Harborview hired Tricia Roland (now O'Donohue) as Stroke Program Manager. *Id.* ¶ 19. From the beginning, Roland treated Brzycki differently from other providers and members of staff who were not Black and who were not natives of Haiti. *Id.* For example, early on, Roland confronted Brzycki and asked her, "How did you get this job? It's a very challenging position," in a disbelieving tone. *Id.* She would ask Brzycki if she felt competent in

---

[4] Brzycki sent Hibbard an email in May 2016 detailing the types of feedback she wanted to receive from the neurologists on her chart notes and patient visits. She did not receive a response from Hibbard regarding her request. *Id.* ¶ 14.

[5] Hare testified that she expected that managers reporting to her would have ongoing conversations with their employees with respect to their job performance. Hare Dep. at 24:15-23. She also expected that managers would have informal coaching sessions with employees before moving to discipline. *Id.* at 26:10-23.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 4
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

her job. Roland also told Brzycki on multiple occasions to be grateful for her job, and she frequently made negative comments about Brzycki's clothing, even though Brzycki always dressed professionally. *Id.* Brzycki understood Roland's statements as expressing that Roland's belief that Brzycki did not belong as a Stroke HCS and that she was in her position as the result of affirmative action rather than based on her own merits. *Id.*

Roland had previously worked in Haiti and was married to a man who is a native of Haiti. O'Donohue Decl. (Dkt. # 29) ¶ 36. It is a stereotype of Haitian women that they are subservient and unlikely to stand up for themselves to managers, supervisors, or others in positions of authority. Brzycki Decl. ¶ 20; Declaration of Lilia Merveus ("Merveus Decl.") ¶ 8. Brzycki's conduct in the workplace was not consistent with that stereotype. Brzycki spent her formative years in New York City and is outspoken and assertive. Brzycki Decl. ¶ 20. She is unafraid to question her managers and supervisors when she believes that their actions are unjust or unfair. *Id.*

Roland repeatedly asked Brzycki to cook Haitian food and bring it into the office for her. *Id.* ¶ 21.[6] Roland was visibly unhappy when Brzycki declined to do so. *Id.*  Roland also asked Brzycki to invite her to gatherings of Haitian people and to speak Creole with her. *Id.* When Brzycki did not conform to Roland's stereotypical notions about Haitian women, Roland admonished Brzycki that she was "very Americanized," that she was not like a typical Haitian woman, and that it was "a shame" that Brzycki did not cook Haitian food. *Id.*

Roland soon began to micromanage Brzycki and treat her in a controlling manner that was inappropriate for Brzycki's role as a Health Care Specialist. *Id.* ¶ 22. Prior to Roland's hire, Brzycki had worked independently and managed her own schedule in consultation with the Stroke Center directors, Dr. David Tirschwell and Dr. Kyra Becker. *Id.* Nevertheless, Roland began to scrutinize Brzycki's schedule and assign her time-consuming tasks that did not require an ARNP license and were more appropriate for the Stroke Resource Nurse, such as answering phones, managing the nurse triage in-basket, and conducting seven-day follow-up

---

[6] Roland also asked Lilia Merveus, a Haitian Harborview employee whom she met through Brzycki, to bring her Haitian food at work. Merveus did so on several occasions. Merveus Decl. ¶ 7.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 5
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

calls. *Id.* These assignments diverted Brzycki from her primary duties of preparing for patient visits, meeting patients, managing follow-up care coordination, and documenting her patient visits in chart notes. *Id.*

Roland also frequently interrupted Brzycki's work by entering her office without knocking or by banging on Brzycki's office door. *Id.* ¶ 23. She threatened Brzycki's job when she did not respond immediately to two non-urgent pages. *Id.* Roland's insistence that Brzycki attend certain non-mandatory meetings (at the expense of patient care) and be at her beck and call restricted Brzycki's role and the terms and conditions of her job. *Id.*

In September 2016, Brzycki invited Roland to attend a birthday party for her friend Lilia Merveus's child. *Id.* ¶ 24; Merveus Decl. ¶ 6. Merveus is also of Haitian national origin, and other Haitian individuals attended the party. Brzycki Decl. ¶ 24; Merveus Decl. ¶ 2. When pizza was served at the party instead of Haitian food, Roland was visibly upset. Brzycki Decl. ¶ 24.

By mid-October, Brzycki began to seek alternative places at Harborview where she could work quietly and without interruption. *Id.* ¶ 25. Nevertheless, she was always accessible by cell, and she notified the Stroke Resource Nurse and Stroke Program Coordinator where she would be when she worked outside of the Stroke Center Office. *Id.*

**D.   Roland initiates an investigation of Brzycki.**

Brzycki repeatedly explained her understanding of her role and priorities as Stroke HCS to Roland. Brzycki Decl. ¶ 26. Roland, however, dismissed her concerns, and told her to "just do your job," and "stop questioning everything." *Id.* Frustrated, Brzycki began to reach out to her higher-level managers for help. *Id.* On November 3, Brzycki emailed Hare to seek help clarifying to Roland her priorities and her ability to manage her own time. Fix Decl. Ex. F. In her email, she disclosed that she sometimes punched out and continued working in order to avoid being reprimanded for accruing overtime. *Id.* Hare simply told Brzycki to "engage with" Roland. *Id.*

When she had not received a substantive response to her request for help from Hare by November 14, Brzycki emailed Paananen for assistance. Fix Decl. Ex. G. She again disclosed

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 6
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

that she was doing work off the clock in order to avoid accruing overtime. *Id.* Paananen did not respond to her email. *Id.*

During this period, Brzycki began to experience effects of stress resulting from her discriminatory work environment, including insomnia and dizziness. *Id*. ¶ 29. On November 14, she reached out to UW Carelink and received contact information for a counselor. *Id.* She began to see counselor Reid Stell regarding her workplace stress on November 23. *Id.*

On November 17, Roland gave Brzycki a letter informing her that an investigation had been initiated regarding "discrepancies in your attendance and hours of work, and concerns with your work performance." O'Donohue Decl. Ex. E. Brzycki was upset and humiliated when she received the letter. Brzycki Decl. ¶ 30. Prior to receiving this letter, Brzycki was unaware that Roland had concerns about her attendance and hours of work. *Id.* Although Roland and Brzycki had disagreed about prioritization of patient care and meetings, Roland had never explicitly discussed with Brzycki her expectations for Brzycki's work hours, attendance, or job priorities. *Id.*

Unknown to Brzycki, Roland began documenting Brzycki's conduct months prior, in mid-September, and had initiated an investigation. *See* O'Donohue Decl. ¶¶ 10, 12. Although Roland had identified what she believed were discrepancies between Brzycki's clock-in time and arrival at work as early as September. *See Id.* ¶ 10, Roland did not give Brzycki the courtesy of discussing her concerns directly with her. Brzycki Decl. ¶ 31. Instead, she began to collect a dossier of information about Brzycki which she shared with Balch and others. Roland Decl. ¶ 13; Fix Decl. Ex. H.[7]

Brzycki told Roland that she intended to file a complaint of discrimination with UCIRO. Brzycki Decl. ¶ 32. Roland replied that Harborview management was behind her "100 percent." *Id.* On November 18, Brzycki emailed UCIRO to complain that Roland had been subjecting her to "bullying and discrimination." Louie Decl. (Dkt. # 35) Ex. B. Brzycki also

---

[7] Brzycki denies that she unreasonably pushed back against Roland's demand that she attend certain meetings. Brzycki Decl. ¶ 27. The language of the email thread speaks for itself. *See* O'Donohue Decl. Ex. D. She also denies that she was "defensive, argumentative, and obstructive" in a November 14 meeting in which she reasonably raised her concerns about management of the Stroke Center in-basket. Brzycki Decl. ¶ 27.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 7
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

submitted a written complaint regarding Roland's treatment of her to Hare and Paananen. Fix Decl. Ex. I. She alleged that she had been the subject of "prejudice" and of a punitive culture in the Stroke Center. *Id.*

On November 21, Brzycki met with UCIRO investigator Beth Louie about her complaint. Brzycki Decl. ¶ 33. Brzycki reported that she was concerned that Roland was discriminating against her on the basis of her national origin. *Id.* She told Louie that she believed Roland expected her to conform to the stereotype that Haitian women are submissive. *See* Fix Decl. Ex. J. Louie dismissed Brzycki's concerns as a likely "misunderstanding" with her manager. Brzycki Decl. ¶ 33. Brzycki received no further follow-up from UCIRO and did not learn until discovery in this case that UCIRO had closed her complaint as "outside of purview." *Id.*

On November 29, Brzycki and her Union representative Sabrina Snow met with interim Human Resources Consultant Kim Francis regarding Brzycki's complaint to Hare and Paananen about Roland's conduct. *See* Francis Decl. (Dkt. # 33) ¶ 8 & Ex. B. Francis was serving as Human Resources Consultant in a temporary capacity; her ordinary role was as a Leave Specialist responsible for managing employees' disability leaves and accommodations. Fix Decl. Ex. R ("Francis Dep.") at 11:13-21; 13:5-9. Francis had not received any training on conducting investigations and acknowledged that her investigation of Brzycki's complaint may have been her first. *Id.* at 18:7-18. Brzycki told Francis that she believed that Roland was stereotyping her based on Roland's experience in Haiti and was treating her negatively based on her race. Brzycki Decl. ¶ 34; Declaration of Sabrina Snow ("Snow Decl.") ¶ 4. Francis, however, failed to document Brzycki's concerns about race and national origin stereotyping in her notes. *See* Francis Decl. Ex. R.

The investigation of Brzycki initiated by Roland proceeded in December 2016. The first of three investigatory interviews took place on December 5. Brzycki Decl. ¶ 35. Brzycki was again represented by Snow. *Id.* The interview was primarily conducted by Roland, who used an accusatory tone while questioning Brzycki and frequently interrupted Brzycki's attempts to answer. *Id.* During the meeting, Brzycki stated that the investigation would not have happened

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 8
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

if she were not Black. Brzycki Decl. ¶ 35. Brzycki learned during the course of the interview that Roland had accused her of stealing time and being unavailable at work.[8] *Id.* She also learned for the first time that although she was a salaried employee, she was not allowed to clock in remotely, work unpaid hours, or work on patient matters at home. *Id.* Once she was notified of these policies, she stopped working from home or working unpaid overtime. *Id.*

**E.    Brzycki takes her first medical leave.**

Shortly after the investigatory interview, Brzycki began to experience blurred vision and lightheadedness. *Id.* ¶ 36. She saw her health care provider, Elizabeth Schuringa ARNP, who diagnosed high blood pressure, panic disorder, and anxiety. *Id.* Schuringa placed Brzycki on medical leave for four weeks for treatment of the anxiety and panic disorder brought on by her work environment. *Id.* Schuringa later extended Brzycki's leave. *Id.*

In December, Brzycki learned that Harborview had renewed her privileges and reappointed her to its Adjunct Medical Staff. Brzycki Decl. Ex. B. She also received an email from the UW Medicine Lead Compliance Analyst informing her that she had received a score of 100% on an audit of her billing records. Brzycki Decl. Ex. C at 3-4. She forwarded the email about the audit results to the Stroke Center directors, her managers, and Balch. *Id.* at 2.

On January 11, 2017, while Brzycki was still on leave, Francis sent Brzycki a letter claiming that Brzycki had "indicated" during their November 29 meeting that the incidents she described were "likely not harassment" but instead were the result of management changes. Francis Decl. Ex. D. Brzycki rejects Francis's characterization of her statements and maintains that she did not concede that Roland's conduct was not harassment. Brzycki Decl. ¶ 39; *see* Snow Decl. ¶ 4. The letter from Francis indicates that she was "unable to substantiate allegations of harassment." Francis Decl. Ex. D. This finding is unsurprising since Francis only spoke with Roland and Hare about Brzycki's complaint. *Id.* Francis did not interview any other witnesses as part of her investigation. *Id.*

---

[8] Ordinarily, Harborview shared its allegations against an employee with the Union before an investigatory meeting, but it did not do so in Brzycki's case. Snow Decl. ¶ 7. In addition, Roland and Balch refused to allow Snow to keep copies of the documents that were discussed during the meeting. This, too, was unusual conduct in Snow's experience. *Id.* ¶ 6.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 9
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

On January 17, 2017, Schuringa released Brzycki to return to work effective February 2 with a requested accommodation of "a private, quiet place to work to avoid anxiety in the workplace." Declaration of Christie J. Fix in Support of Plaintiff's Motion for Partial Summary Judgment ("Fix SJ Decl.") (Dkt. # 40) Ex. D.

**F.    Harborview continues its investigation and places Brzycki on administrative leave.**

After the first investigatory meeting, Union representative Snow spoke with Balch to relay concerns that Roland was biased against Brzycki because Brzycki did not cooperate with Roland's interest in meeting people from Haiti. Snow Decl. ¶ 8. Balch brushed off Snow's concerns. *Id.*

Roland and Balch summoned Brzycki to a second investigatory interview on February 13. Brzycki Decl. ¶ 41. In this interview they stated that they were adding more allegations to the investigation about Brzycki. *Id.* Roland continued to interrogate Brzycki and asked for very specific details about Brzycki's activities on specific days as much as five months prior to the meeting. *See, e.g.*, Balch Decl. Ex. E at UWMB00002407-2410. After the meeting, Brzycki gave Roland and Balch documentation of the hours that she had worked without claiming overtime pay and proof that she had worked before and after clocking in. Brzycki Decl. ¶ 41.

The following day, on February 14, Brzycki sent an email to Hare correcting additional errors in Roland's accounting of her time away from the office and again complained that Roland's actions were discriminatory. Brzycki Decl. ¶ 42; Balch Decl. Ex. F.  That same day, Harborview placed Brzycki on paid administrative leave. A third and final investigatory interview was held on February 16, while Brzycki was on leave. *See* Balch Decl. ¶ 23.

**G.    Roland issues Brzycki the highest step of discipline short of termination.**

After the third investigatory interview, Brzycki heard nothing from Harborview for nearly two months—an unusually long period of time in Snow's experience. Snow Decl. ¶ 9. On April 7, Brzycki received a packet of information that included a Step C Final Counseling Letter, along with a detailed action plan and—for the first time during Brzycki's tenure as Stroke HCS—a job description. *See* Balch Decl. Ex. J. Roland participated in discussions leading to the decision to issue the Step C discipline, drafted portions of the Final Counseling

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 10
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

Letter, and drafted the job description. O'Donohue Decl. ¶¶ 24-25. The Step C discipline was the first discipline Brzycki ever received at Harborview. Brzycki Decl. ¶ 43. By issuing Step C discipline, Harborview skipped the first two steps of the progressive discipline process set forth in the Collective Bargaining Agreement between Harborview and Brzycki's union and moved directly to the step preceding termination. *See* Fix Decl. Ex. K. When she received the Final Counseling letter, Brzycki again contacted UCIRO to ask the department to revisit the allegations of discrimination that she had described in her November 18 email. Brzycki Decl. ¶ 43. Through her Union, she filed a grievance challenging the Step C discipline as contrary to just cause. *Id.* ¶ 44.

Brzycki returned to work from administrative leave on April 18. Her return to work was brief, however, because she was deeply distraught that Roland had issued the Step C discipline. *Id.* ¶ 45. When she started having panic attacks at work, her health care provider Rachel Sternoff, ARNP, placed Brzycki on medical leave beginning April 26 through July 1 for treatment for "increased anxiety, panic attacks, and elevated blood pressure associated with work." Fix SJ Decl. Exs. F & G.

Brzycki filed EEOC Charge No. 551-2017-01080 in April 2017, alleging discrimination on the basis of her race and national origin and retaliation for making complaints of discrimination. McLaughlan Decl. Ex. C. Roland, Hare, and Balch received notice of the EEOC charge on April 27, 2017. Fix Decl. Ex. L.

## H.   Roland issues a "non-negotiable" schedule as an "accommodation."

Brzycki incorporates by reference the statement of relevant facts in her Motion for Partial Summary Judgment (Dkt. # 39 at 4-11) and the declarations filed in support thereof (Dkt. ## 40 & 41). A brief summary is provided below.

In late June, Sternoff released Brzycki to return to work on July 1 on a reduced schedule of twenty hours per week for two months. On June 30, Roland emailed Brzycki a schedule that purported to satisfy the part-time schedule Sternoff recommended. Roland developed the schedule without any input from Brzycki.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 11
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

Brzycki responded in detail, noting that the schedule was impractical in light of the production expected of her in an abbreviated schedule. Brzycki stated that she could not see six patients on a clinic day at a part-time schedule because she typically saw five patients on a clinic day when working full-time. Although Brzycki offered alternatives, Roland flatly refused to consider Brzycki's request for changes to the proposed schedule. Instead, she declared that the proposed part-time schedule was "not up for negotiation." She removed Francis, who was then acting as Leave Representative and was therefore responsible for managing disability accommodations, from her response to Brzycki.

Brzycki returned to work on July 5. Roland repeatedly threatened Brzycki's job when she tried to raise concerns about her workload or her health. Brzycki Decl. ¶ 46(a). On July 11, Brzycki was unable to complete and document appointments with six patients within the five-hour workday. She worked 7.5 hours that day, contrary to the work restrictions placed by her medical provider.

The next day, Roland directed Brzycki to cancel a pre-scheduled appointment with her counselor and verbally threatened her with disciplinary action if she attended her appointment. Brzycki Decl. ¶ 46(a). On July 12, Stell placed Brzycki on medical leave due to her anxiety.

Brzycki complained to Director of Medical Centers Human Resources Jennifer Petriz that Roland's non-negotiable part-time schedule was retaliatory. In an email, Roland described to Petriz her purported justifications for the non-negotiable schedule. As explained in detail in Plaintiff's Motion for Summary Judgment, these "justifications" were based on improper considerations, incorrect assumptions, and falsehoods rather than on determining an effective accommodation for Ms. Brzycki. *See* Dkt. # 39 at 12-18.

## I. Brzycki's resignation.

On July 19, while on leave, Brzycki completed an intake interview with UCIRO investigator Alina McLauchlan regarding her complaints of discrimination and retaliation. McLauchlan Decl. ¶ 6. UCIRO finally opted to proceed with an investigation. UCIRO notified Roland and Hare of Brzycki's complaint on August 9. Fix Decl. Ex. V.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 12
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

On August 15, Brzycki attempted to return to work, but Hare sent her home. Brzycki Decl. ¶ 47. The next day, Brzycki filed EEOC Charge No. 551-2017-01858, alleging failure to accommodate, discrimination on the basis of disability, and retaliation for filing her May 2017 EEOC charge. McLauchlan Decl. ¶ 7.

During summer and fall 2017, Brzycki applied for ARNP positions elsewhere in the UW Medicine system in an effort to remove herself from Roland. Brzycki Decl. ¶ 49. Her attempts to transfer, however, stalled. *Id.* Receipt of Step C discipline can prevent an employee from transferring to another department within UW Medicine. Fix Decl. Ex. S ("Paananen Dep.") 120:1-11 ("[T]raditionally we wouldn't want to move someone with performance issues to a new area."); Hare Dep. 117:16-118:2; Balch Dep. 162:3-15.

In September, Brzycki received an offer to work as an ARNP at the Veterans Affairs Puget Sound Healthcare System in Seattle. Brzycki Decl. ¶ 50. Although she wanted desperately to remain at Harborview, she feared further discrimination and retaliation and, therefore, tentatively accepted the VA's offer. *Id.* While her credentialing with the VA was in process, Brzycki continued to work with Stell to submit multiple requests to Harborview for a transfer as an accommodation for her anxiety. *Id.* Brzycki returned to work briefly in November 2017 but was again consumed by anxiety and returned to medical leave. *Id.*

By mid-November, Harborview gave Brzycki notice that it would not offer her a transfer to another department as an accommodation. *Id.* ¶ 51. Upon learning Harborview's decision, Brzycki concluded that she had no other option to protect her health but to leave Harborview. *Id.* Brzycki resigned her position at Harborview in late November 2017 and began working at the VA in January 2018. *Id.*

## III.   ARGUMENT AND AUTHORITY

### A.   Summary Judgment Standard

"Summary judgment is appropriate if there is no genuine dispute of material fact viewing the evidence in the light most favorable to the nonmoving party." *Folkens v. Wyland Worldwide, LLC*, 882 F.3d 768, 773 (9th Cir. 2018) (internal quotation marks and citation omitted); Fed. R. Civ. P. 56. The movant bears the initial burden to demonstrate the absence of

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 13
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute of a material fact is "one that could reasonably be resolved in favor of either party." *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986).

The Ninth Circuit imposes a high standard for granting summary judgment in employment discrimination cases. *Mayes v. Amazon.com.dedc LLC*, No. C18-176 MJP, 2019 WL 2357898, at *2 (W.D. Wash. June 4, 2019). A court must "zealously guard[ ] an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *Weil v. Citizens Telecom Servs. Co.*, 922 F.3d 993, 1001-02 (9th Cir. 2019) (quoting *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004)). "[V]ery little . . . evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder." *Id.* (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996)).

**B.    The Court should deny summary judgment on Brzycki's failure to accommodate claim.**

Brzycki has not alleged claims for failure to accommodate based on Defendants' refusal of her request for a job transfer or her request to avoid communication with her manager. *See* Amended Complaint (Dkt. # 24) ¶¶ 7.1-7.6. In addition, following discovery, Brzycki withdrew her claim for failure to accommodate the request for a private, quiet place to work. Brzycki, however, strongly disputes Defendants' assertion that they granted her request for the accommodation of a part-time work schedule. *See* Defs. Mot. at 23. To the contrary, as Brzycki argues in her Motion for Partial Summary Judgment (Dkt. # 39 at 12-18), Defendants violated the Washington Law Against Discrimination ("WLAD") by failing to engage in good faith in the interactive process to identify and adopt reasonable measures to accommodate Brzycki's

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 14
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

disability in June and July 2017. Brzycki incorporates that Motion and its supporting declarations by reference here.

Defendants argue that Stell's testimony that he "didn't consider her disabled" in November 2017 "alone defeats Brzycki's accommodations claim." Defs. Mot. at 22. Defendants are wrong. First, it was Sternoff, not Stell, who placed Brzycki on medical leave in April 2017 and requested the accommodation of a part-time schedule upon Brzycki's return to work in July 2017. *See* Fix SJ Decl. (Dkt. # 40) Ex. H. Stell's deposition testimony regarding requests for transfer that he made months later is irrelevant to Brzycki's July 2017 return to work. Second, contrary to Defendants' representations, Stell *did* diagnose Brzycki with anxiety and *did* identify psychological limitations that prevented Brzycki from performing the functions of her job when she returned to medical leave in July 2017. *See* Fix Decl. Ex. T ("Stell Dep.") at 118:6-13, 119:13-21; Fix SJ Decl. Ex. S. Finally, Stell does not have any legal education or training, nor can he recall receiving any training on disability accommodations. Stell Dep. at 42:15-17; 44:2-15. The reasonable inference to draw from this testimony is that Stell was not referring to the *legal* definition of disability under the WLAD. The Court should reject Defendants' specious argument regarding Stell's testimony.

## C.   The Court should deny summary judgment on Brzycki's race and national origin discrimination claims.

Under the *McDonnell Douglas* framework, the plaintiff in an employment discrimination case bears the initial burden of establishing a prima facie case of discrimination by showing (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably, or other circumstances surrounding the adverse action give rise to an inference of discrimination. *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). If the plaintiff succeeds, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant does so, then the plaintiff must produce evidence that the defendant's articulated

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 15
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

reason is pretext for unlawful discrimination. *Id.* Washington courts also apply the *McDonnell Douglas* framework when evaluating claims of discrimination under the WLAD. *Scrivener v. Clark College*, 181 Wn.2d 439, 445, 334 P.3d 541 (2014).

Here, there is no dispute that Brzycki is a member of a protected class. The remaining elements of the prima facie case, however, are in dispute.

### 1.   Brzycki was qualified for her position.

Before Roland became Brzycki's manager, Brzycki received no negative feedback about her performance and reasonably understood that her performance was satisfactory. Brzycki Decl. ¶ 18. *See Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 660 (9th Cir. 2002) (plaintiff's assertion that he was performing his job satisfactorily was sufficient to establish that he was performing satisfactorily for purposes of making a prima facie showing.). She received positive feedback both verbally and in email from the neurologists who worked with stroke patients.[9] Her patients submitted many complimentary "Wow Cards." She received high performance ratings on her only performance review and never received any discipline. She was 100% compliant in her billing activity and was reappointed to the Adjunct Medical Staff.  There was no finding in the investigation that led to the Step C discipline that Brzycki was not qualified for her position. *See* Balch Decl. Ex. J at UWMB007212-15. Indeed, most of the purported performance issues identified in the investigation were based on (1) Brzycki's good-faith misunderstanding of policies based on improper training or direction by her prior managers, (2) alleged failures to meet expectations that had never been communicated to Brzycki, or (3) confusion about her scope of work due to the lack, for over two years, of a job description for the Stroke HCS position. A jury could reasonably infer that Brzycki was qualified for her position.

### 2.   The Step C Discipline was an adverse action.

---

[9] Although Defendants' witnesses describe conversations among themselves about Brzycki's performance in 2015 and 2016, they did not share these concerns with Brzycki. Brzycki Decl. ¶ 18. A factfinder could infer that their concerns were not so weighty as to lead to a conclusion that Brzycki was not performing satisfactorily.

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

An adverse action is one that materially affects the compensation, terms, conditions, or privileges of employment. *Davis v. Team Elec. Co.,* 520 F.3d 1080, 1089 (9th Cir. 2008); *Kirby v. City of Tacoma*, 124 Wn.App. 454, 98 P.3d 827 (2004). An employment action need not rise to the level of a termination, demotion, or unpaid suspension to be materially adverse. To the contrary, whether a particular action is adverse for purposes of a discrimination claim depends on the facts of the case. *See, e.g., Davis v. West One Automotive Group*, 140 Wn.App. 449, 459, 166 P.3d 807 (2007) (finding disputed questions of fact regarding whether defendant's failure to put plaintiff's photo in the paper when he was salesman of the month and refusal to allow him to drive the company car of his choice constituted adverse actions); *Gallerson v. Burlington Northern Santa Fe Railway Co.*, No. C15-5821 BHS, 2019 WL 3006988, at *11-12 (W.D. Wash. Jul. 09, 2019) (finding issues of material fact regarding whether assigning undesirable tasks to an employee constituted an adverse employment action).[10]

The Step C discipline was an adverse action under the facts of this case. It is undisputed that a Step C Final Counseling is the last step in the contractual disciplinary process before termination. In connection with the discipline, Defendants imposed a detailed action plan which changed aspects of Brzycki's work conditions such as the amount of time allotted to prepare for and document patient visits.[11] They also drafted a job description that required Brzycki to work as a backup to the Stroke Resource Nurse (contrary to the direction Paananen gave Brzycki in August 2015) in addition to performing her own duties. In addition, as Defendants' managers admitted, the presence of Step C discipline on an employee's record limits the employee's ability to transfer to another department within UW Medicine. These material effects on the terms, conditions, and privileges of Brzycki's employment lead to the inference that the Step C discipline was an adverse action.

---

[10] Defendants' reliance on *Woods v. Washington*, Fed. App'x 111, 112-13 (9th Cir. 2012) is misplaced. The only effect of the discipline described in that decision was a temporary forfeiture of seniority. *Id.* Here, by contrast, the Step C discipline limited Brzycki's opportunities throughout the UW Medicine system.
[11] For example, although University policy allows providers up to three calendar days to complete clinic notes, the Step C action plan required Brzycki to complete her notes on the same day as her clinic visits. *See* Fix Decl. Ex. N.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 17
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

### 3. "Other Circumstances" give rise to an inference of discrimination.

Contrary to Defendants' assertions, Brzycki need not rely on comparator evidence to establish the fourth prong of her prima facie case. To the contrary, she can rely on "other circumstances" that give rise to an inference of discrimination. *Peterson*, 358 F.3d at 603; *see also Scrivener,* 181 Wn.2d at 445 ("To overcome summary judgment, a plaintiff needs only to show that a reasonable jury could find that the plaintiff's protected trait was a substantial factor motivating the employer's adverse actions.").

It is well-established that employment decisions based on stereotypes constitute unlawful, *intentional* discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989). "To impose liability, a factfinder need only determine that the employer made a challenged decision based on a protected trait." *Kimble v. Wisconsin Dept. of Workforce Development*, 690 F. Supp. 2d 765, 768 (2010). The law does not require the discriminator to be subjectively aware she is discriminating in order for the plaintiff to prevail. *See, e.g., id.* at 768-69*; Raad v. Fairbanks North Star Borough School District*, 323 F.3d 1185, 1196 (9th Cir. 2003) (evidence that coworkers misunderstood plaintiff's statement "because of their preconceptions regarding her religion and national origin" supported a finding of pretext); *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1283-84 (11th Cir. 2000) (employer that made employment decisions based on stereotypes "could be found liable under Title VII for intentional discrimination regardless of whether it was also motivated by ill-will or malice" toward the protected class); *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 58-60 (1st Cir. 1999) ("[U]nlawful discrimination can stem from stereotypes and other types of cognitive biases, as well as from conscious animus.").

Here, Roland's experiences living and working in Haiti exposed her to the stereotype that Haitian women are submissive to individuals in authority. Brzycki does not fit that stereotype: she is outspoken and unafraid to stand up for herself when she believes she is being treated unfairly. Roland became visibly upset when Brzycki refused her requests to cook

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 18
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

Haitian food for her. She told Brzycki that she was unlike other Haitian women, that she was "Americanized," and that it was a "shame" she did not cook Haitian food. When Brzycki failed to meet Roland's expectations of her conduct as a Haitian woman who submitted to her demands, Roland began to micromanage Brzycki and scrutinize her whereabouts. She questioned Brzycki's dress and made statements that implied that she was surprised Brzycki held such a "challenging" job.[12] Rather than meet with Brzycki to discuss her concerns in accordance with Hare's expectations for the managers who reported to her, Roland collected a dossier of documents that formed the basis of an investigation that led to serious discipline. This conduct by Roland gives rise to an inference of discrimination.

> **4.**      **The evidence reveals ample evidence of pretext.**

Brzycki assumes for the purposes of this brief that Defendants have produced evidence of a "legitimate nondiscriminatory reason" for imposing some level of discipline. She contends, however, that her case should proceed to trial because discrimination was nevertheless a substantial motivating factor in the decision. An employee can satisfy the pretext prong of the *McDonnell Douglas* framework by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer. *Scrivener*, 181 Wn.2d at 446-47; *see also Stegall v. Citadel Broadcasting Co.,* 350 F.3d 1061, 1068 (9th Cir. 2003) (plaintiff can show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence."). Under the WLAD, "An employee does not need to disprove each of the employer's articulated reasons to satisfy the pretext burden of production." *Scrivener,* 181 Wn.2d at 447. "An employer may be motivated by multiple purposes, both legitimate and illegitimate, when making employment decisions and

---

[12] Roland's statements could also be taken as direct evidence of discrimination. "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial.... Direct evidence is evidence, which, if believed, proves the fact of discriminatory animus without inference or presumption." *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221–22 (9th Cir.1998).

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 19
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

still be liable under the WLAD." *Id.* It is the plaintiff's burden at trial to prove only that the unlawful motive "was a substantial factor in an adverse employment action, not the only motivating factor." *Id.* Thus, even if a factfinder were to conclude that Step C discipline was warranted in this case, Defendants are liable as long as Brzycki's race and/or national origin were a substantial factor in the decision to discipline her.

Here, Brzycki alleges that Roland's discriminatory animus against her as a Haitian and Black woman influenced Defendants' decision to impose Step C discipline. This case, therefore, is governed by the "cat's paw" theory of liability. *See Boyd v. State, Dept. of Social and Health Servs.*, 187 Wn.App. 1, 20, 249 P.3d 864 (2015); *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011). Under the "cat's paw" theory, if a biased actor performs an act motivated by discriminatory animus that the biased actor intends to cause an adverse employment action, and if that act is relied on by the employer and is a substantial factor in the ultimate employment action, then the employer must be held liable. *See Boyd*, 187 Wn.App. at 20 (citing *Staub*, 562 U.S. at 422).[13]

Brzycki does not dispute that she violated certain Harborview policies, and she does not dispute that some level of discipline would have been appropriate. What is in dispute, however, is whether Roland's discriminatory animus was a substantial factor in the decision to skip the first two steps in the contractual progressive discipline process and impose the most serious level of discipline short of termination. In *Boyd*, for example, the Court of Appeals found that the plaintiff established pretext by showing that the employer had notice of the retaliatory supervisor's bias but nevertheless allowed the biased supervisor to be involved in the investigation. *Boyd*, 187 Wn.App. at 20. Here, Roland, a biased supervisor, initiated the investigation, provided many of the documents considered during the investigation, conducted the first two investigatory interviews, participated in discussions regarding the level of

---

[13] Although *Boyd* and *Staub* are retaliation cases, the "cat's paw" theory of liability has also been applied in discrimination cases. *See, e.g. Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 (6th Cir. 2012) (quoting *Staub*, 562 U.S. at 422).

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 20
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

discipline to impose, and assisted in drafting the Step C Final Counseling letter. As a result, a jury could reasonably find that Roland's bias against Brzycki on the basis of her race and/or national origin influenced and was a substantial factor leading to the discipline decision.

The harshness of the discipline and the irregularities in the process that led to it provide additional evidence of pretext. Many of the alleged concerns that Defendants identified during their investigation could be explained by Brzycki's misunderstanding of various policies as a result of the many months she spent without managerial support in 2015 and 2016. For example, Brzycki genuinely believed that she was a salaried employee and that she could work off-the-clock at home or offsite. Although she had previously communicated to her managers her belief that she was salaried, that she worked off-site, and that she worked off the clock, Defendants never corrected her misunderstanding of their policies until the first investigatory meeting. She thought she was allowed to take patient work off-site based on direction she received from Johnson, who even provided her a USB drive on which to save patient information. With respect to charting efficiency, Brzycki had not received any prior feedback that her notes were too long, too detailed, or not of use. Indeed, she had been told by Johnson and Tirschwell to make her notes *more thorough.* Brzycki Decl. ¶ 8; *id.* Ex. C at 1. Finally, Brzycki had received no prior discipline during her employment at Harborview. With respect to the investigation process, Snow observed that Defendants did not follow their ordinary practices of giving the Union information about the allegations against Brzycki and allowing Snow to keep copies of documents that were reviewed during the investigation meetings.

Based on the foregoing, Brzycki has more than met her burden to satisfy the pretext prong of the *McDonnell Douglas* framework. The Court should deny Defendants' motion for summary judgment.

**D.    The Court should deny summary judgment on Brzycki's retaliation claim.**

Brzycki engaged in multiple activities protected under Title VII and the WLAD during her tenure at Harborview. In August 2015 she complained to Hare that Johnson and Drury were using racially insensitive language to describe employees of color. On November 18, 2016, she

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 21
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

complained to Hare and Paananen that Roland was subjecting her to prejudice and bullying and informed Francis of her concerns of race discrimination and stereotyping during the investigation. She told Roland that she would be filing an UCIRO complaint, and did so. On February 14, 2017, she complained to her managers that the investigation process was discriminatory. She filed an EEOC charge in April 2017. She complained again of discrimination and retaliation to UCIRO in July 2017. Relevant to her claim for retaliation under the WLAD, Brzycki also requested disability accommodations and medical leaves throughout 2017.

In response to Brzycki's protected activities, Defendants engaged in a number of adverse actions. In the retaliation context, an "adverse action" need not affect the terms and conditions of employment: it is enough that the conduct would dissuade a reasonable employee from engaging in protected activity. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). Whether a particular action would be viewed as adverse by a reasonable employee is a question of fact appropriate for a jury. *Boyd*, 187 Wn.App. at 13-14. Here, Defendants conducted an investigation of Brzycki between November 2016 and April 2017 that did not follow usual processes for communication with the Union. In February 2017, they placed Brzycki on paid administrative leave the day after she complained that the investigation was discriminatory. In April 2017, they imposed the most serious discipline short of termination and imposed a strict action plan. In July 2017, Roland imposed an impossible part-time schedule as a purported "accommodation," refused to engage in the interactive process with respect to that accommodation, and threatened Brzycki when she raised concerns about that schedule. A juror could find that these actions were adverse under the facts of this case.

With respect to causation, Defendants ignore that this case involves an ongoing pattern of discriminatory conduct by Defendants and multiple complaints by Brzycki, most of which were made between November 2016 and July 2017. Causation under both the WLAD and Title VII can be inferred "from timing alone" when there is a close proximity between the time the

employee engaged in protected activity and the time of the adverse action. *Hollenbeck v. Shriners Hospitals for Children*, 149 Wn.App. 810, 823, 206 P.3d 337 (2009) (proximity under WLAD where termination occurred two months after protected activity); *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004) (proximity under Title VII where the employee was placed on probation seven weeks after the protected activity). Although Defendants argue that temporal proximity causation does not apply to Ms. Brzycki's August 2015 complaint, they make no such argument with respect to her 2016 and 2017 complaints, which were soon followed by materially adverse actions.

In addition, the Step C discipline decision relied in part on an email by Tirschwell regarding his view of Brzycki's performance. *See* Balch Decl. ¶¶ 24, 26 & Ex. G. Notably, Tirschwell stated in an interview with UCIRO investigator Alina McLauchlan that he believed that complaints by Brzycki led to Johnson's departure. Fix Decl. Ex. O at UWMB003708.[14] The jury can thus infer that he had retaliatory animus against Brzycki for making her August 2015 complaint against Johnson. *See Boyd*, 187 Wn.App. at 20 (citing *Staub*, 562 U.S. at 422).

Defendants' reliance on *Carrington v. Des Moines*, 481 F.3d 1046 (8th Cir. 2007), is inapt. In *Carrington*, after being investigated for performance concerns, the plaintiff initiated a series of generalized complaints of racial discrimination over a period of two years. *Carrington v. City of Des Moines*, 2006 WL 8437387 at *4 (S.D. Iowa Feb. 22, 2006). Additionally, the plaintiff could not identify specific acts of retaliation in response to complaints of discrimination made a year prior to his termination. *Id.* at *5-6. Apart from the fact that the plaintiff was, in fact, subject to discipline and eventually terminated for performance concerns, the plaintiff presented no evidence of discrimination or retaliation. 481 F.3d at 1052. In contrast, Brzycki's claims of discrimination and retaliation relate to actions taken by a specific supervisor, Roland, which predate the November 2016 investigation. Moreover, Brzycki contends that the investigation initiated in November 2016 investigation was itself discriminatory. The fact that a discriminatory investigation was initiated prior to Brzycki's

---

[14] Tirschwell testified that he "thought [Johnson] was great." Fix Decl. Ex. U (Tirschwell Dep.) at 72:11-73:7.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 23
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

formal complaints of harassment and discrimination in no way suggests that Roland's subsequent actions were not retaliatory.

Finally, Brzycki can establish pretext by showing that either (1) that the defendant's reason is pretextual or (2) although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer. *Scrivener*, 181 Wn.2d at 446-47. Here, with respect to the Step C discipline, the evidence described *supra* at Section C.4 and Tirschwell's comments about Brzycki's discrimination complaint leading to Johnson's resignation support an inference that retaliatory animus was a substantial factor in the discipline. With respect to the July 2017 "non-negotiable" part-time schedule, Roland failed to follow the University's policies with respect to the interactive process and admitted that she refused to accommodate based on perceived "performance" issues by Brzycki. On this record, a jury could easily infer that retaliation was a substantial motivating factor for the adverse actions Brzycki experienced.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion for Summary Judgment.

DATED this 16th day of December, 2019.


FRANK FREED SUBIT & THOMAS LLP

By:*/s/* Christie J. Fix
Christie J. Fix, WSBA # 40801
705 Second Avenue, Suite 1200
Seattle, WA 98104
Phone: (206) 682 6711
Email:  cfix@frankfreed.com
Attorneys for Plaintiff

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 24
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel/parties of record. I hereby certify that no other parties are to receive notice.

DATED at Seattle, Washington on this 16th day of December, 2019.

*/s/Sarah Gunderson*
Sarah Gunderson

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 25
NO. 2:18-cv-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798 ~ (206) 682-6711