# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

MARTHILDE BRZYCKI,

                Plaintiff,

    v.

HARBORVIEW MEDICAL CENTER, et al.,

                Defendants.

CASE NO. C18-1582 MJP

ORDER ON MOTIONS FOR SUMMARY JUDGMENT

The above-entitled Court, having received and reviewed:

1. Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 39), Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 44), and Plaintiff's Reply in Support of Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 61);

2. Defendants' Motion for Summary Judgment (Dkt. No. 28), Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 50), Defendants' Reply in Support of Defendants' Motion for Summary Judgment (Dkt. No. 57), and Plaintiff's

| | |
|---|---|
| 1 | Surreply to Defendants' Reply in Support of Defendants' Motion for Summary |
| 2 | Judgment (Dkt. No. 65); |

all attached declarations and exhibits, and relevant portions of the record, rules as follows:

IT IS ORDERED that Plaintiff's motion for partial summary judgment is DENIED.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment is DENIED.

**Background**

The undisputed facts of this litigation are as follows:

Plaintiff, a Haitian native who emigrated to the United States at eleven, holds a master's degree in nursing and a license as an Advanced Registered Nurse Practitioner ("ARNP"). Dkt. No. 52, Decl. of Brzycki, ¶¶ 2-3. She was hired by Defendants in November 2014 as an ARNP in Harborview's Stroke Clinic, becoming a full-time Stroke Health Care Specialist two months later. Id. at ¶ 3. Prior to the latter stages of her employment at the Stroke Clinic, there was no written job description of her duties.

Plaintiff's tenure at the Stroke Clinic was not a smooth one. Administrators report concerns about Plaintiff's performance early on (*see* Dkt. No. 30, Decl. of Hare, ¶ 8; Dkt. No. 34, Decl. of Paananen, ¶ 4), while Plaintiff's complaints about her first supervisor and a co-worker led to both internal and external investigations which confirmed issues with the supervisor's management skills but also with Plaintiff's performance. Decl. of Hare, Ex. A.

Problems escalated with the arrival of a new Stroke Program Manager – Tricia Roland[1] – in August 2016. From the onset of their relationship, Plaintiff felt that Roland treated her

---
[1] Ms. Roland has since changed her name to O'Donohue, but the Court will follow the convention of the parties and refer to her as "Roland" since that is how her name appears in the relevant exhibits to these pleadings.

differently from other staff members, in a way which she understood as an expression of Roland's opinion that Plaintiff was not qualified for her position. Decl. of Brzycki, ¶ 19. Plaintiff experienced Roland's management style as "micromanaging" and over-controlling, and considered some of the tasks which Roland assigned her to be outside the scope of her role as an ARNP. Id. at ¶ 22. For her part, Roland developed concerns about how Plaintiff was spending her time, whether she was fulfilling her duties and whether she was being truthful about the work hours she was claiming. Dkt. No. 29, Decl. of Roland, ¶¶ 9-12. The stress of the work environment led Plaintiff to inquire about counseling from UW Carelink. Decl. of Brzycki at ¶ 29.

Eventually Roland's concerns led her to approach University of Washington HR Consultant Nola Balch. Id. at ¶ 12; Dkt. No. 31, Decl. of Balch, ¶ 13. The two agreed that a formal investigation was in order and on November 17, 2016, Roland issued Plaintiff a Notice of Investigatory Meeting to take place on December 5, 2016. Decl. of Roland, ¶ 15, Ex. E. On the day after receiving notice of investigation, Plaintiff emailed the Stroke Clinic administrators to complain about Roland and the investigation. Dkt. No. 33, Decl. of Francis, Ex. A.

Plaintiff also contacted the University Complaint Investigation and Resolution Office ("UCIRO") and initiated a complaint which alleged discriminatory treatment by Roland. Dkt. No. 35, Decl. of Louie, Exs. A and B.[2] Whether Roland was aware of this complaint is a matter of dispute. Decl. of Roland, ¶ 35; Decl. of Brzycki, ¶ 32. Plaintiff and her union representative also met with UW HR Consultant Kim Francis and shared Plaintiff's concerns that she was being treated negatively on the basis of her race. Decl. of Brzycki at ¶ 34; Dkt. No. 54, Decl. of Snow at ¶ 4.

---

[2] The UCIRO investigation was eventually closed with a finding of no proof of discrimination. Id. at ¶ 6.

1    The first investigatory interview was conducted on December 5, 2016.  Two days later,

2    Plaintiff requested and received approval for medical leave based on a diagnosis of high blood

3    pressure, panic disorder, and anxiety (Decl. of Brzycki at ¶ 36); the original leave period (until

4    January 11, 2017) was extended to February 13, 2017 (although Plaintiff returned earlier).  Decl.

5    of Roland at ¶¶ 18-19.  A second investigatory interview took place on February 13, 2017.  Id. at

6    ¶ 20.  Following that interview, Plaintiff sent an email to Roland, copying other Harborview

7    administrators and three physicians who had not been involved in the investigation,

8    characterizing Roland's allegations regarding irregularities in her work conduct as "lies" and

9    accusing her of discrimination and attempting to destroy her career.  Decl. of Balch, Ex. F.

10   Plaintiff was placed on administrative leave the same day, pending the outcome of the

11   investigation.  Decl. of Hare, Ex. E.

12       The third and final investigatory meeting was held on February 16, 2017.  Decl. of Balch,

13   ¶ 23; Decl. of Roland, ¶ 22, Exs. H and I.   Following the final interview, the investigators

14   solicited feedback regarding Plaintiff from the Stroke Center Medical Director (Dr. Tirschwell)

15   and another stroke physician (Dr. Becker).  Their comments described her as "disruptive," "not a

16   team player," and "the center of conflict."  Dr. Becker expressed concerns about the lack of

17   efficiency and utility in Plaintiff's chart notes, while the Medical Director expressed his opinion

18   that Plaintiff should no longer be employed by Harborview.  Decl. of Roland, Exs. G and J.

19       The investigatory findings confirmed a history of time and attendance issues (e.g.,

20   clocking in before actually arriving at the clinic, working remotely and off the clock), issues of

21   work performance (e.g., failure to attend rounds, mishandling of personal health information,

22   misuse of time and hospital resources) and other instances of questionable conduct (e.g.,

23   insubordination, lack of honesty).  Decl. of Balch, ¶ 26, Ex. I.  A decision was reached among

24

the clinic administration to issue Plaintiff a "Step C" Final Counseling Letter with an accompanying Action Plan identifying the improvements which would be required of Plaintiff in order to retain her position. Plaintiff was provided with these documents on April 7, 2017. Id., ¶¶ 26-27, Ex. J. Plaintiff had never before received a disciplinary action. Decl. of Brzycki, ¶ 43. "Step C" is the step preceding termination and in issuing this letter, the Harborview administration skipped over the first two steps in the progressive discipline process. Dkt. No. 51, Decl. of Fix ("SJ Decl."), Ex. K.[3] The Final Counseling Letter included the scheduling of a Final Counseling session, which took place on April 18, 2017. Decl. of Balch at ¶ 28.

Plaintiff remained at work for only short period of time, going out on approved medical leave again from April 26 to July 1, 2017 for "increased anxiety, panic attacks, and elevated blood pressure associated with work." Decl. of Roland, ¶ 28; Decl. of Francis, ¶ 12; Dkt. No. 40, PSJ Decl. of Fix, Exs. F and G. On April 27, 2017, Roland, Hare, and Balch received notice of an EEOC complaint filed by Plaintiff alleging discrimination of the basis of race and national origin, and retaliation. Dkt. No. 36, Decl. of McLauchlan, Ex. C; Dkt. No. 51, SJ Decl. of Fix, Ex. L.

On June 27, 2017, University of Washington HR received an FMLA request that Plaintiff return to work on July 1, 2017 on a part-time basis (working up to 20 hours per week) for the next two months. Decl. of Francis, ¶ 13, Ex. E. Roland drafted a 20-hour/week schedule (Decl. of Roland, ¶ 29, Ex. K) which she provided to Plaintiff on June 30, 2017. Plaintiff had concerns about the feasibility of the schedule (which had been drafted without input from her) – among other things, a requirement that she see six patients in a five-hour day (more than she would see

---

[3] "The University will determine the specific step at which the process begins based on the nature and severity of the problem." Dkt. No. 51-11, CBA at Article 21.1.

in a day when working full-time previously); she expressed those concerns in a June 30 email to Roland, who replied:

> This schedule/workflow is not up for negotiation, though as ever if you run into challenges in meeting work expectations you should come to me right away so that we can engage in a problem solving discussion to review workflow, priorities, and strategies.

Id., Ex. L.

Plaintiff returned to work on July 5, 2017. A week later, she delivered a Health Care Provider Statement ("HCPS") from her counselor Reid Stell requesting medical leave of indefinite duration beginning July 15, 2017. Decl. of Francis, ¶ 17, Ex. H. The request was approved and Plaintiff went on leave after her July 14 shift. Id. While on leave, Plaintiff initiated another UCIRO complaint alleging discrimination and retaliation (Decl. of McLauchlan at ¶ 6) and additionally communicated to the Stroke Clinic (through her counselor) her requests to have Roland only communicate with her via email, to revise her days and hours of work, and to transfer her to another clinic if those conditions could not be met. Dkt. No. 38, Decl. of Berntsen, Ex. D. Balch was unsuccessful in getting Plaintiff to respond to her invitation to discuss the request. Decl. of Balch at ¶ 30.

Plaintiff was advised by the clinic administrators and HR that Harborview could not accommodate her new requests, but that she could continue her leave status if desired. Decl. of Balch, ¶ 30, Ex. K; Decl. of Francis, ¶ 19, Ex. K. Plaintiff initiated another EEOC complaint, alleging failure to accommodate, discrimination, and retaliation. Decl. of McLauchlan at ¶ 7.

Between September and November of 2017, a series of events occurred which included Plaintiff seeking other employment (Decl. of Brzycki at ¶ 50; Brzycki Dep. 504:19-505:2) while continuing to negotiate a return to work at Harborview. Decl. of Francis, ¶¶ 20-22, Exs. L and M. Plaintiff returned to work briefly on November 8, then the following week submitted another

1 HCPS request through her counselor that she be placed on medical leave until she could be
2 transferred to another position. Decl. of Francis, ¶ 23, Ex. O. Plaintiff returned to medical leave,
3 although her counselor identified no physical or cognitive restrictions on her ability to work. Id.,
4 Ex. S; Stell Dep. 13:6-16.
5      Between November 27 and 29, 2017, HR Consultant Francis exchanged a series of
6 emails with Plaintiff advising that, with no indicated restrictions on her ability to perform her
7 ARNP duties, Plaintiff had to either return to work or provide updated medical information
8 relative to any restrictions on performing her job. Id., ¶ 27, Ex. T. When Plaintiff did neither,
9 Francis advised her that the University would interpret her failure to either return to work or
10 provide updated medical information as a resignation. Id. As of November 30, 2017, the
11 University accepted Plaintiff's resignation. Id., Ex. U.
12      On October 29, 2018, Plaintiff initiated this lawsuit, filing a complaint alleging racial
13 discrimination, disability discrimination/failure to accommodate, and retaliation in violation of
14 federal and state laws. Dkt. No. 1.

15 **Discussion**

16 Standard of review

17     Plaintiff has filed a motion for partial summary judgment; Defendants have filed a
18 motion for summary judgment of dismissal of all of Plaintiff's claims.
19     "The court shall grant summary judgment if the movant shows that there is no genuine
20 dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.
21 Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving
22 party fails to make a sufficient showing on an essential element of a claim in the case on which
23 the nonmoving party has the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 323
24

(1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."); Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 253 (1986); T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association, 809 F.2d 626, 630 (9th Cir. 1987).

The Ninth Circuit has provided additional guidance when an employer brings a motion for summary judgment in an employment discrimination case. Such motions must be carefully examined in order to zealously guard an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses. McGinest v. GTE Service Corp., 360 F.3d 1103, 1112 (9th Cir. 2004). This high standard means that an employee need only produce "very little evidence" to survive summary judgment in a discrimination case because the ultimate question is one that can only be resolved through a "searching inquiry" – one that is most appropriately conducted by the factfinder, upon a full record. Schnidrig v. Columbia Mach., Inc., 80 F.3d 1406, 1410 (9th Cir. 1996) (internal quotations omitted).

Plaintiff's Motion for Partial Summary Judgment

Plaintiff seeks partial summary judgment in the form of a ruling that, as a matter of law, the part-time work schedule offered by Defendants failed to reasonably accommodate her disability and thus violated the Washington Law Against Discrimination ("WLAD"), RCW 49.60. She argues that (1) the part-time schedule (especially its requirement that she see six

patients in a five-hour day) was not a reasonable accommodation and (2) Defendants failed to engage in an interactive process in reaching their proposed accommodation as required by law.

To make a prima facie case of failure to accommodate under WLAD, an employee must demonstrate that:

1. She had a sensory, mental, or physical abnormality that substantially limited her ability to perform her job;
2. She was qualified to perform the essential functions of her job, with or without accommodation;
3. She gave the employer notice of the abnormality and its accompanying substantial limitations; and
4. Upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality.

Davis v. Microsoft Corp., 149 Wn.2d 521, 532 (2003); RCW 49.60.040(7)(e).

The Court is not prepared, as a matter of law, to hold that Plaintiff is entitled to summary judgment on this claim. In the first place, the schedule originally created by Roland met the criteria for accommodation as articulated in Plaintiff's request; the Family and Medical Leave Certification of Health Care Provider for Personal Serious Health Condition prepared by Ms. Sternoff and submitted as Plaintiff's request for accommodation simply states: "Patient can return to work 20 hours per week x 2 months." Decl. of Francis, Ex. E.

While Plaintiff responded with a communication indicating why she believed the proposed part-time schedule would not work, her argument that Defendants – in informing her that "[t]his schedule/workflow is not up for negotiation" – failed thereafter to engage in an interactive process is a simplistic reduction of a complex situation. Defendants had a history of

interactions with Plaintiff which the clinic administration viewed as demonstrative of Plaintiff's propensity for doing things her own way regardless of established procedures (*see* Decl. of Balch, Investigatory Findings at Ex. I); viewing the evidence in the light most favorable to the nonmoving party, as the Court must, it cannot be said that a reasonable jury would unquestionably find for Plaintiff on this point. The fact that Defendants clearly stated their willingness to engage in additional discussion and possible revision of the schedule if Plaintiff "[ran] into challenges in meeting work expectations" and that Plaintiff presents no evidence that she attempted further negotiation of the schedule once she had had her initial experience with it (in fact, she skipped scheduled meetings with management on July 5 and 12 [Decl. of Roland, ¶¶ 30-31, Ex. M] and then simply left the job again 10 days after returning) further undercuts her position that any failure to engage in an interactive process lies solely with Defendants.

The law is clear that, when more than one accommodation is possible, an employer is permitted to choose the form of accommodation it seeks to offer; the choice is not the employee's. Frisino v. Seattle Sch. Dist. No. 1, 160 Wn.App. 765, 779 (2011). That the accommodation ultimately chosen must be reasonable is axiomatic, but the employer is also permitted, as part of the accommodation process, to engage in a "trial and error" approach where an initial accommodation is offered and then, if it becomes apparent that something different is needed, an alternative approach is explored. ("The employer may wish to test one mode of accommodation and then test another, if the first mode fails. Or, if the attempt to accommodate is not effective, one or more additional attempts may be undertaken. The statute does not limit the employer to only one attempt at accommodation;" Frisino, *supra* at 781.) A reasonable jury could find that Defendants were prepared to engage in that trial and error process in this instance,

and were thwarted only by Plaintiff's refusal to participate in a dialogue aimed at reaching a mutually beneficial solution.

Plaintiff is not entitled to partial summary judgment in her favor on the issue of the reasonableness of Defendants' accommodation.

Defendants' Motion for Summary Judgment[4]

Mindful of the Ninth Circuit's admonitions regarding summary judgment in employment discrimination cases, the Court will deny summary judgment to Defendants also.

*Discrimination claims*

Because Plaintiff has no direct evidence of disparate treatment, her discrimination claims (under both state and federal law) are analyzed under the burden-shifting analysis of McDonnell Douglas. Plaintiff must first make a *prima facie* case by establishing (1) that she belonged to a protected class; (2) she "was qualified for [her] position[] and performing [her] job[] satisfactorily," (3) she experienced an adverse employment action; and (4) that either (a) similarly situated individuals outside her protected class received more favorable treatment, or (b) that "other circumstances surrounding the adverse employment action give rise to an inference of discrimination." Gilmore v. Boeing Co., 2018 WL 883875, at *4 (W.D. Wash. Feb. 14, 2018)(*citing* Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1155 (9th Cir. 2010)). The burden then shifts to Harborview to articulate a legitimate nondiscriminatory reason for its actions. Villiarimo v. Aloha Island Air, 281 F.3d 1054, 1062 (9th Cir. 2002), then back to Plaintiff to produce evidence of pretext. Id.

---

[4] Defendants moved, in their reply brief, to strike as inadmissible hearsay a statement by Plaintiff in her responsive briefing that she had received positive feedback from Harborview neurologists. Dkt. No. 57, Defs' Reply at 3, n.1. The motion is denied – the statements were made by employees of Defendants on a matter within the scope of their employment relationship. FRE 801(2)(d).

Defendants make no argument that Plaintiff is not a member of a protected class, but challenge every other element of Plaintiff's *prima facie* case. While not asserting that Plaintiff was not qualified for her position, Defendants cite the Investigatory Findings and Final Counseling Memorandum as proof of Plaintiff's unsatisfactory performance. For her part, Plaintiff identifies the source of her "purported performance issues" as a good faith misunderstanding of Harborview's policies, uncommunicated expectations from her supervisors, and the absence of any written job description for her position. While neither denying nor discounting the evidence that Plaintiff was a difficult employee, the Court is also mindful that Plaintiff's response to the stresses at her workplace led to a series of leave periods which make it difficult to assess whether (based on her new understanding of her responsibilities and Harborview's expectations) she would have been able to improve her performance in the wake of the investigation and issuance of the Final Counseling Letter. A jury could reasonably infer that the facts do not establish that Plaintiff was incapable of satisfactorily performing her duties.

Defendants also maintain that the "Step C" Final Counseling Letter was not an adverse employment action, defined as an action that "materially affect[s] the compensation, terms, conditions, or privileges of . . . employment." Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008)(internal citation omitted). It is not unreasonable to say that the "Step C" letter (which is the last step in the employee discipline process before termination) and the accompanying action plan – which Plaintiff alleges without contradiction altered the amount of time allotted to prepare for and document patient visits (*see* Dkt. No. 56, Plaintiff Response at 18) – constituted changes in the conditions of her employment. Nor do Defendants controvert Plaintiff's assertion that the presence of Step C discipline on her record represented an

impediment to her transferring to another department within the UW system. A jury could reasonably infer that any or all of these amounted to an adverse employment action.

While Defendants make the point that, as the only Health Care Specialist in the Stroke Clinic, Plaintiff has no comparators, the law also permits her to establish the fourth prong of her *prima facie* case through proof of "other circumstances" that give rise to an inference of discrimination. Peterson v. Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004). Plaintiff's evidence of discrimination – comments related to her qualifications for her position, information regarding Roland's history with Haitians and Haitian culture combined with interactions related to Plaintiff's Haitian heritage – is not strong nor particularly indicative of conscious animus, but it need not be. "[U]nlawful discrimination can stem from stereotypes and other types of cognitive biases, as well as from conscious animus." Thomas v. Eastman Kodak Co., 183 F.3d 38, 59 (1st Cir. 1999). Additionally, as mentioned previously, the Ninth Circuit has made it clear that in employment discrimination cases only a "very little evidence" is required to survive summary judgment. Schnidrig, *supra* at 1410.

Plaintiff indicated her willingness to assume, for purposes of the motion, that Defendants have produced evidence of a "legitimate nondiscriminatory reason" for the discipline she received. The case law permits her to proceed with her discrimination claim by offering evidence, not of pure pretext, but evidence that while the employer's stated reason may be legitimate, discrimination nevertheless was a "substantial factor" underlying the employer's actions. Scrivener v. Clark College, 181 Wn.2d 439, 446-47 (2014); *see also* Stegall v. Citadel Broadcasting Co., 350 F.3d 1061, 1068 (9th Cir. 2003).

That evidence is comprised primarily of the substantial role that Roland played in the initiation and conduct of the investigation as well as its ultimate outcome, and the fact that –

despite Plaintiff never having received a disciplinary review or rebuke before – the administration chose to forego the first two steps of the institution's progressive discipline procedure and go straight to the third and most serious level of discipline, the "Step C" Final Counseling Letter, one step away from termination.  The Court is satisfied that, for purposes of surviving this motion, Plaintiff has produced a sufficient amount of evidence to satisfy her burden of raising an inference from which a jury could reasonably find that discrimination was a "substantial factor" in the process to which Plaintiff was subjected.

Summary judgment for Defendants on the discrimination claims will be denied on that basis.

*Retaliation claims*

Again, Plaintiff has come forward with no direct evidence of retaliation, so the Court will apply the McDonnell Douglas burden-shifting analysis.  In the context of an allegation of retaliation, Plaintiff is required to establish (for both Title VII and the WLAD) a *prima facie* case through proof that (1) she engaged in a protected activity, (2) suffered an adverse action, and (3) there is a causal connection between the protected activity and the adverse action.[5]  Vasquez v. County of Los Angeles, 349 F.3d 634, 646 (9th Cir. 2003). "Adverse action" has a different definition than in the discrimination context; adverse action amounting to retaliation consists of conduct which would dissuade a reasonable worker from engaging in protected activity.  BNSF Railway Co. v. White, 548 U.S. 53, 68 (2006).

The Court agrees with Defendants' analysis of Plaintiff's retaliation claim in the following regard: there is no evidence that protected activity by Plaintiff was the proximate cause

---

[5] Title VII employs a "but for" causational test (Villiarimo, *supra* at 1064-65); WLAD requires that the protected activity be a "substantial factor" in the adverse decision.  WPI 330.05.  This distinction will not affect the outcome of the Court's analysis *infra*.

of the investigation initiated on November 17, 2016. Plaintiff's only protected activity prior to the onset of the investigation was her August 2015 UCIRO complaint, a complaint which did not involve Roland (who was not even employed by Harborview at that point) and was made 15 months prior to the initiation of investigation. Proximity in time is critical to a retaliation claim; causation will not lie unless the "adverse employment action follows on the heels of protected activity." Villiarimo, *supra* at 1065.

Plaintiff engaged in two acts of arguably protected activity following the announcement of the investigation and the issuance of the Final Counseling Letter: a November 18, 2016 UCIRO complaint (Decl. of Louie at ¶¶ 6-8) and a May 2017 EEOC Charge of Discrimination. Decl. of McLauchlan, ¶ 5, Ex. C. The Court is well aware that the timing of these actions, particularly in the context of a retaliation claim, risks a finding that Plaintiff – rather than availing herself of her statutory and constitutional rights by engaging in protected activity – was in fact abusing the anti-retaliation remedy.

> "[P]ost-hoc complaints did not without more raise a retaliation bar to the proposed discipline because 'the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace.' Indeed, complaining of discrimination in response to a charge of workplace misconduct is an abuse of the anti-retaliation remedy." Griffith v. City of Des Moines, 387 F.3d 733, 738 (8th Cir. 2004).

Carrington v. City of Des Moines, 481 F.3d 1046, 1051 (8th Cir. 2007).

There are two factors which preclude the Court from a finding that, as a matter of law, Plaintiff has failed to establish a *prima facie* case of retaliation. The first is Defendants' decision, at the conclusion of the disciplinary process, to go straight to the third step of their progressive disciplinary "ladder," the Step C Final Counseling Letter, for an employee who had

never received a disciplinary action before.[6] The second is Defendants' action in unilaterally (at least, without consulting Plaintiff) creating a part-time work schedule for her which required her to see more patients in a five-hour work day than she previously had seen in a full eight-hour day. Defendants assert that there are not even any arguably retaliatory acts after the issuance of the Final Counseling Letter; the Court does not agree. In light of the fact that (as seen *infra*) the Court is not prepared to say as a matter of law that the 20-hour per week schedule was a reasonable accommodation, there will no ruling that the conditions of the part-time schedule were not retaliatory as a matter of law, either.

While Plaintiff certainly cannot create a *post hoc* retaliation situation vis-à-vis the investigation itself by her decision to initiate complaints against her supervisor and the management at Harborview after the fact, neither can the hospital shield itself from the consequences of potentially overly-harsh disciplinary measures or potentially unreasonable accommodations by simply questioning Plaintiff's motives for filing complaints/engaging in protected activity after the investigation was launched.

This case represents a complex series of interlocking events; actions and counteractions by a number of parties over an extended period of time. While the vast majority of the facts are not in dispute, the gravamen of these legal issues resides in the parties' *intentions* behind their actions – intentions which may or may not have been as represented in the documents and declarations in this record and which may well require an ultimate finder of fact to draw the necessary conclusions from the dense narrative of action and reaction that forms the basis of this lawsuit. As the Ninth Circuit has noted, it does not lend itself well to summary judgment.

---

[6] As noted *supra*, Roland's claim that she was unaware of the November 2016 UCIRO complaint prior to the issuance of the Final Counseling Letter is a matter of dispute. Decl. of Roland, ¶ 35; Decl. of Brzycki, ¶ 32.

1       Continuing to keep in mind the low bar for the amount of evidence required for Plaintiff to defeat summary judgment in this context, the Court finds that there is adequate evidence of Plaintiff's *prima facie* case of retaliation. Again, Plaintiff does not controvert that Defendants have articulated legitimate, non-retaliatory reasons for their behavior. As regards pretext, the Court incorporates by reference its previous analysis of that factor from the preceding section – here as before Plaintiff has produced sufficient evidence that a jury might reasonably infer that, although Defendants' stated reasons for their actions are legitimate, retaliation was nevertheless a substantial factor behind the decisions.

      Summary judgment for Defendants on the retaliation claims will be denied.

*Failure to accommodate claim*

      The Court incorporates by reference the recitation of the elements of this cause of action from the preceding portion analyzing Plaintiff's motion for partial summary judgment.

      Defendants assert a right to a finding as a matter of law that the accommodation which they offered Plaintiff was reasonable. They base this argument at least in part on the fact that they gave Plaintiff exactly what her caregiver asked for in her June 2017 request to return to work (a part-time 20-hour work week). Defendants cannot cling so tenaciously to the barest letter of the law and expect dispositive summary victory.

      The duty of accommodation arises when the employee provides "notice of the abnormality and its accompanying substantial limitations." Gamble v. City of Seattle, 6 Wn.App.2d 883, 888-889 (2018). Defendants cite to no authority which permits them to treat Plaintiff's June 2017 request in a vacuum; i.e., as if the only thing she had requested or needed was 20 less hours in her work week. Prior to their receipt of that request, Defendants had received at least two other communications regarding Plaintiff's "abnormality and its

accompanying substantial limitations:" Plaintiff's December 5, 2016 request for medical leave based on a diagnosis of high blood pressure, panic disorder, and anxiety (Decl. of Brzycki at ¶ 36); and her requested medical leave from April 26 to July 1, 2017 for "increased anxiety, panic attacks, and elevated blood pressure associated with work" (both of which Harborview approved). Decl. of Roland, ¶ 28; Decl. of Francis, ¶ 12; PSJ Decl. of Fix, Exs. F and G.

Under the accommodation schedule proposed by Defendants, Plaintiff was expected to work five hours per day, four days per week, with Thursdays off. PSJ Decl. of Fix, Ex. M. Her Tuesday schedule required her to see six patients in the clinic during the course of her five-hour day. Id. Prior to going on medical leave and while working full-time at the clinic, Plaintiff would schedule five patients during an eight-hour Tuesday clinic day. In other words, the schedule intended to accommodate her disability was requiring Plaintiff to do as much, if not more, in a five-hour day as she would have been expected to do in a full day of work. Decl. of Brzycki at ¶ 21.

Defendants seek a summary judgment ruling that, as a matter of law, the part-time schedule they offered Plaintiff represented a reasonable accommodation of her disability without explaining how requiring an employee with a known history of panic disorders related to stress in the work environment to do more in five hours than she previously had done in eight represents the affirmative adoption of measures that were available to them and medically necessary to accommodate Plaintiff's abnormality. Davis, *supra* at 532; RCW 49.60.040(7)(e).

The Court finds that a jury could reasonably infer that, in fact, the accommodation offered Plaintiff in terms of her work schedule was not reasonable. Defendants' request for summary judgment of dismissal of Plaintiff's failure to accommodate claim is denied.

**Conclusion**

The bottom line for both of these motions is that this case, which represents an unusual intersection of claims involving employment discrimination, disability accommodation, and retaliation, simply does not lend itself to disposition by means of summary judgment. While the facts underlying the allegations are relatively undisputed, liability will lie (or not) based on the intentions of the parties in undertaking the actions which they did. As the Ninth Circuit has commented:

> In evaluating motions for summary judgment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses.

McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1112 (9th Cir. 2004).

Summary judgment will be denied as to both motions.

The Clerk of the Court is ordered to provide copies of this order to all parties.

Dated: March 13, 2020

_____
Marsha J. Pechman
United States Senior District Judge