THE HONORABLE MARSHA J. PECHMAN

1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

9

MARTHILDE BRZYCKI,

10                                  Plaintiff,

11   vs.

12

13   HARBORVIEW MEDICAL CENTER and
UNIVERSITY OF WASHINGTON,

14

15                                  Defendants.

CASE NO.:  2:18-cv-01582-MJP

**PLAINTIFF'S TRIAL BRIEF**

16

## I.   INTRODUCTION

17          Plaintiff Marthilde Brzycki formerly worked as an Advanced Registered Nurse Practitioner

18   ("ARNP") at Harborview Medical Center where she was an employee of the University of

19   Washington. Until the University hired Tricia O'Donohue (formerly Tricia Roland) as Brzycki's

20   manager, Brzycki had received positive feedback about her work from the physicians she worked

21   with and the patients she served. Before her hire at Harborview, O'Donohue previously lived in

22   Brzycki's native country of Haiti, where she lived in a residence that employed Haitian women as

23   cooks. O'Donohue described her experiences in Haiti as being treated "like a queen" and admired

24   by Haitian women for "beautiful white skin." Based on her experiences living in Haiti, O'Donohue

25   adopted stereotypes and biases about the appropriate roles and behaviors of "real Haitian woman,"

26   that informed her perception of and interactions with Brzycki at Harborview.  When Brzycki did

27

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

not conform to these expectations, O'Donohue launched an investigation that led to the University imposing on Brzycki the most serious level of discipline short of termination. O'Donohue also refused to engage in an interactive process to develop a reasonable accommodation for Brzycki's anxiety and, along with other managers, retaliated against Brzycki for making complaints of discrimination. Brzycki now brings this action for discrimination on the basis of race and national origin in violation of the Civil Rights Act of 1964 ("Title VII") and the Washington Law Against Discrimination ("WLAD"); retaliation in violation of Title VII and the WLAD; and failure to accommodate her disability in violation of the WLAD. She seeks damages for economic losses she suffered during her employment at Harborview and emotional distress damages under state and federal law.

## II.  STATEMENT OF FACTS

Plaintiff Marthilde Brzycki is Black and is a native of Haiti. She moved to the U.S. when she was eleven years old and continues to speak with a strong Haitian accent. Brzycki began her University employment at Harborview Medical Center in 2011 as a part-time/per diem Registered Nurse ("RN"). She received "distinguished" and "successful" marks on the one performance review she received while she was an RN in late October, 2014.

After receiving her master's degree and her ARNP license, Brzycki began working as a full-time hourly Registered Nurse 2 in Harborview's Stroke Center in November 2014. She became a full-time Stroke Health Care Specialist ("HCS") in January 2015, after Harborview approved her ARNP privileges. Based on the language of her offer letter, Brzycki understood that she was an exempt salaried employee. Brzycki was the only Black and Haitian-American employee working in the Stroke Center and was one of very few Black employees working with stroke patients at Harborview.

As Brzycki quickly learned, the Stroke Center had a history of patient complaints, high staff turnover, and long wait times for patients to receive follow-up care after being discharged from the hospital. To address these concerns, she developed and implemented algorithms to

improve patient care. She received positive feedback verbally and in email from the neurologists with whom she worked, in addition to many "Wow Cards" from patients thanking her for her high-quality care

## A.      Brzycki's first discrimination complaint.

Brzycki's first year and a half at the Stroke Center were tumultuous due to the departure, in quick succession, of two Stroke Center Program Managers. The first Stroke Program Manager for whom Brzycki worked was Vicki Johnson. Brzycki was not provided a formal job description when she began working as the Stroke HCS. Instead, Brzycki learned her responsibilities by shadowing Johnson, who had been performing both the Stroke Program Manager and Stroke HCS roles before Brzycki was hired. Johnson trained Brzycki on how to complete chart notes by giving her a template to use as a guide. She instructed Brzycki to provide plenty of detail because the notes were meant for the patient's primary care doctors, consulting specialists, and rehabilitation facilities or nursing homes. Johnson also encouraged Brzycki to prepare for patient visits by reviewing records at home over the weekend and gave Brzycki a USB drive on which she could save patient information for when she worked at home. Johnson also permitted the Stroke Resource Nurse, Dawn Drury, to complete work off-site.

Before long, Brzycki observed Johnson making racially charged comments about minority staff members and patients. In August 2015, Brzycki complained to Johnson's manager, Assistant Administrator for Patient Care Services Kathy Hare, about Johnson's conduct. Brzycki informed Hare that Johnson had used racially insensitive language to describe employees of color. Brzycki also described concerns about Johnson's management skills and communication style. Hare assigned Human Resources Consultant Nola Balch to investigate Brzycki's complaint. Brzycki also complained to the University of Washington's University Complaint Investigation and Resolution Office ("UCIRO"). Although Balch concluded that Johnson had not engaged in a hostile work environment, she did find deficiencies in Johnson's leadership skills. Johnson went on leave in December 2015 and never returned to work.

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

Brzycki also met with Director of Health Care Specialists Kelly Paananen in August 2015 regarding her concern that Johnson was asking her to do work outside of her scope as a Health Care Specialist. Paananen agreed with Brzycki that tasks such as answering phones and managing the nurse triage EPIC in-basket should not be done by the Stroke HCS. She told Brzycki to focus on her clinic practice and on training the Stroke Resource Nurse as needed. Paananen documented this discussion in an email to Hare.

After the 2015 investigation, Hare asked Abby Tesfamariam, then Director of Nursing for procedural areas, to assess the Stroke Center operations. Tesfamariam noted that Johnson had concerns about Brzycki's documentation practices and efficiency. She also made findings regarding Brzycki's rounding practices and coordination with physicians and nurses. None of Brzycki's managers met with Brzycki to discuss the concerns identified in Tesfamariam's report, nor did they put anything in place to notify Brzycki of the concerns or help her address them. Tesfamariam also noted that Stroke Resource Nurse Drury reviewed patient charts in the mornings on the train. Paananen, too, noted that the Stroke Resource Nurse worked remotely during her morning commute.

After Johnson left, Miryah Hibbard served as an Interim Stroke Program Manager while Harborview sought a full-time replacement. Although Hibbard made efforts to better define Brzycki's job responsibilities, Hibbard was often absent from work and she, too, failed to provide a job description or clear scope of duties for Brzycki. Hibbard gave Brzycki positive feedback and discussed with her the possibility of transitioning to the Stroke Program Manager role when Hibbard returned to her previous position at Harborview.

Hibbard went on leave in or about June 2016. By July 2016, Hibbard, too, had separated from Harborview. Hare then stepped in to manage the team. Hare did not instruct Brzycki not to work off-site or off-the-clock.

It is a University expectation that all employees will receive a yearly performance evaluation. Although Brzycki had started working as a Health Care Specialist in January 2015, she

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

still had not received a review by July 2016. Eager for feedback on her job performance, Brzycki asked Hare to conduct a performance review and identified colleagues to participate in the review. Despite these requests, Brzycki did not receive a single performance review during her time working in the Stroke Center.

**B.      Tricia O'Donohue's arrival at Harborview.**

In August 2016, Harborview hired Tricia O'Donohue (then Tricia Roland) as Stroke Program Manager. From the beginning, O'Donohue treated Brzycki differently from other providers and members of staff who were not Black and who were not natives of Haiti. For example, early on, O'Donohue confronted Brzycki and asked her, "How did you get this job? It's a very challenging position," in a disbelieving tone. She would ask Brzycki if she felt competent in her job. O'Donohue also told Brzycki on multiple occasions to be grateful for her job, and she frequently made negative comments about Brzycki's clothing, even though Brzycki always dressed professionally. Brzycki understood O'Donohue's statements as expressing that O'Donohue's belief that Brzycki did not belong as a Stroke HCS and that she was in her position as the result of affirmative action rather than based on her own merits.

O'Donohue had previously worked in Haiti and was married to a man who is a native of Haiti. As Brzycki and her friend and former coworker Lilia Merveus, who is also of Haitian national origin will testify, within Haitian culture, women are widely viewed as belonging either in the home or in the service industry. Even in the U.S., it is rare to see Haitian women, or immigrant women of color generally, in management and leadership positions such as the one Ms. Brzycki held. Brzycki did not conform to stereotypes ascribed to Haitian women as being deferential or submissive. She spent her formative years in New York City and is outspoken and assertive. She is unafraid to question her managers and supervisors when she believes that their actions are unjust or unfair.

O'Donohue repeatedly and insistently asked Brzycki and her friend Lilia Merveus, who is also of Haitian national origin, to cook Haitian food and bring it into the office for her. O'Donohue

PLAINTIFF'S TRIAL BRIEF - 5
CASE NO. 2:18-CV-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

was visibly unhappy when Brzycki declined to do so. O'Donohue also asked Brzycki to invite her to gatherings of Haitian people and to speak Creole with her. When Brzycki did not conform to O'Donohue's expectations about the conduct of Haitian women, O'Donohue admonished Brzycki that she was "very Americanized," that she was not like a typical Haitian woman, and that it was "a shame" that Brzycki did not cook Haitian food.

O'Donohue soon began to micromanage Brzycki and treat her in a controlling manner that was inappropriate for Brzycki's role as a Health Care Specialist. Prior to O'Donohue's hire, Brzycki had worked independently and managed her own schedule in consultation with the Stroke Center directors, Dr. David Tirschwell and Dr. Kyra Becker. Nevertheless, O'Donohue began to scrutinize Brzycki's schedule and assign her time-consuming tasks that did not require an ARNP license and were more appropriate for the Stroke Resource Nurse, such as answering phones, managing the nurse triage in-basket, and conducting seven-day follow-up calls. These assignments diverted Brzycki from her primary duties of preparing for patient visits, meeting patients, managing follow-up care coordination, and documenting her patient visits in chart notes.

O'Donohue also frequently interrupted Brzycki's work by entering her office without knocking or by banging on Brzycki's office door. She threatened Brzycki's job when she did not respond immediately to two non-urgent pages. O'Donohue's insistence that Brzycki attend certain non-mandatory meetings (at the expense of patient care) and be at her beck and call restricted Brzycki's role and the terms and conditions of her job.

In September 2016, Brzycki invited O'Donohue to attend a birthday party for Merveus's child. Merveus is also of Haitian national origin, and other Haitian individuals attended the party. When pizza was served at the party instead of Haitian food, O'Donohue was visibly upset.

By mid-October, Brzycki began to seek alternative places on the Harborview campus where she could work quietly and without interruption. Nevertheless, she was always accessible by cell, and she notified the Stroke Resource Nurse and Stroke Program Coordinator where she would be when she worked outside of the Stroke Center Office.

PLAINTIFF'S TRIAL BRIEF - 6
CASE NO. 2:18-CV-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

**C.      O'Donohue initiates an investigation of Brzycki.**

Brzycki repeatedly tried to explain her understanding of her role and priorities as Stroke HCS to O'Donohue. O'Donohue, however, dismissed her concerns, and told her to "just do your job," and "stop questioning everything." Frustrated, Brzycki began to reach out to her higher-level managers for help. On November 3, Brzycki emailed Hare to seek help clarifying to O'Donohue her priorities and her ability to manage her own time. In her email, she disclosed that she sometimes punched out and continued working in order to avoid being reprimanded for accruing overtime. Hare simply told Brzycki to "engage with" O'Donohue.

When she had not received a substantive response to her request for help from Hare by November 14, Brzycki emailed Paananen for assistance. She again disclosed that she was doing work off the clock in order to avoid accruing overtime. Paananen did not respond to her email.

During this period, Brzycki began to experience effects of stress resulting from her discriminatory work environment, including insomnia and dizziness. On November 14, she reached out to UW Carelink and received contact information for a counselor. She began to see counselor Reid Stell regarding her workplace stress on November 23.

On November 17, O'Donohue gave Brzycki a letter informing her that an investigation had been initiated regarding "discrepancies in [her] attendance and hours of work, and concerns with [her] work performance." Brzycki was upset and humiliated when she received the letter. Before receiving this letter, Brzycki was unaware that O'Donohue had concerns about her attendance and hours of work. Although O'Donohue and Brzycki had disagreed about prioritization of patient care and meetings, O'Donohue had never explicitly discussed with Brzycki her expectations for Brzycki's work hours, attendance, or job priorities.

Unknown to Brzycki, O'Donohue had begun documenting Brzycki's conduct months prior, in mid-September, and had initiated an investigation. Although O'Donohue had identified what she believed were discrepancies between Brzycki's clock-in time and arrival at work as early as September, O'Donohue did not give Brzycki the professional courtesy of discussing her

PLAINTIFF'S TRIAL BRIEF - 7
CASE NO. 2:18-CV-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

concerns directly with her. Instead, she began to collect a dossier of information about Brzycki which she shared with Balch and others.

Brzycki told O'Donohue that she intended to file a complaint of discrimination with UCIRO. On November 18, Brzycki emailed UCIRO to complain that O'Donohue had been subjecting her to "bullying and discrimination." Brzycki also submitted a written complaint regarding O'Donohue's treatment of her to Hare and Paananen. She alleged that she had been the subject of "prejudice" and of a punitive culture in the Stroke Center.

On November 21, Brzycki met with UCIRO investigator Beth Louie about her complaint. Brzycki reported that she was concerned that O'Donohue was discriminating against her on the basis of her national origin. She told Louie that she believed O'Donohue expected her to conform to the stereotype that Haitian women are submissive. Louie dismissed Brzycki's concerns as a likely "misunderstanding" with her manager. Brzycki received no further follow-up from UCIRO and did not learn until discovery in this case that Louie had closed her complaint as "outside of purview."

On November 29, Brzycki and her Union representative Sabrina Snow met with interim Human Resources Consultant Kim Francis regarding Brzycki's complaint to Hare and Paananen about O'Donohue's conduct. Francis was serving as Human Resources Consultant in a temporary capacity; her ordinary role was as a Leave Specialist responsible for managing employees' disability leaves and accommodations. Francis had not received any training on conducting investigations and has acknowledged that her investigation of Brzycki's complaint may have been her first investigation. Brzycki told Francis that she believed that O'Donohue was stereotyping her based on O'Donohue's experience in Haiti and was treating her negatively based on her race. Francis, however, failed to document Brzycki's concerns about race and national origin stereotyping in her notes.

The investigation of Brzycki initiated by O'Donohue proceeded in December 2016. The first of three investigatory interviews took place on December 5. Brzycki was again represented

by Snow. The interview was primarily conducted by O'Donohue, who used an accusatory tone while questioning Brzycki and frequently interrupted Brzycki's attempts to answer. During the meeting, Brzycki stated that the investigation would not have happened if she were not Black. Brzycki learned during the interview that O'Donohue had accused her of stealing time and being unavailable at work. She also learned for the first time that although she was a salaried employee, she was not allowed to clock in remotely, work unpaid hours, or work on patient matters at home. Once she was notified of these policies, she stopped working from home or working unpaid overtime.

**D.      Brzycki takes her first medical leave.**

Shortly after the investigatory interview, Brzycki began to experience blurred vision and lightheadedness. She saw her health care provider, Elizabeth Schuringa ARNP, who diagnosed high blood pressure, panic disorder, and anxiety. Schuringa placed Brzycki on medical leave for four weeks for treatment of the anxiety and panic disorder brought on by her work environment. Schuringa later extended Brzycki's leave.

In December, Brzycki learned that Harborview had renewed her privileges and reappointed her to its Adjunct Medical Staff. She also received an email from the UW Medicine Lead Compliance Analyst informing her that she had received a score of 100% on an audit of her billing records. She forwarded the email about the audit results to the Stroke Center directors, her managers, and Balch.

On January 11, 2017, while Brzycki was still on leave, Francis sent Brzycki a letter claiming that Brzycki had "indicated" during their November 29 meeting that the incidents she described were "likely not harassment" but instead were the result of management changes. Brzycki, however, maintains that she never conceded that O'Donohue's conduct was not harassment. The letter from Francis indicates that she was "unable to substantiate allegations of harassment." This finding is unsurprising since Francis only spoke with O'Donohue and Hare about Brzycki's complaint. Francis did not interview any other witnesses as part of her

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104–1798
(206) 682-6711

investigation.

On January 17, 2017, Schuringa released Brzycki to return to work effective February 2 with a requested accommodation of "a private, quiet place to work to avoid anxiety in the workplace."

**E.   Harborview continues its investigation and places Brzycki on administrative leave.**

After the first investigatory meeting, Union representative Snow spoke with Balch to relay Brzycki's concerns that O'Donohue was biased against Brzycki because she did not cooperate with O'Donohue's interest in meeting people from Haiti. Balch brushed off Snow's concerns.

O'Donohue and Balch summoned Brzycki to a second investigatory interview on February 13. In this interview they stated that they were adding more allegations to their investigation. O'Donohue continued to interrogate Brzycki and asked for very specific details about Brzycki's activities on specific days as much as five months prior to the meeting. After the meeting, Brzycki gave O'Donohue and Balch documentation of the hours that she had worked without claiming overtime pay and proof that she had worked before and after clocking in.

The following day, on February 14, Brzycki sent an email to Hare correcting additional errors in O'Donohue's accounting of her time away from the office and again complained that O'Donohue's actions were discriminatory. That same day, Harborview placed Brzycki on paid administrative leave. A third and final investigatory interview was held on February 16, while Brzycki was on leave.

**F.   O'Donohue issues Brzycki the highest step of discipline short of termination.**

After the third investigatory interview, Brzycki heard nothing from Harborview for nearly two months—an unusually long period of time in Snow's experience. On April 7, Brzycki received a packet of information that included a Step C Final Counseling Letter, along with a detailed action plan and—for the first time during Brzycki's tenure as Stroke HCS—a job description. O'Donohue participated in discussions leading to the decision to issue the Step C discipline, drafted portions of the Final Counseling Letter, and drafted the job description. The Step C discipline was the first

PLAINTIFF'S TRIAL BRIEF - 10
CASE NO. 2:18-CV-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104–1798
(206) 682–6711

discipline Brzycki had ever received at Harborview. By issuing Step C discipline, Harborview skipped the first two steps of the progressive discipline process set forth in the Collective Bargaining Agreement between the University and Brzycki's union and moved directly to the step preceding termination. When she received the Final Counseling letter, Brzycki again contacted UCIRO to ask the department to revisit the allegations of discrimination that she had described in her November 18 email. Through her Union, she filed a grievance challenging the Step C discipline as contrary to just cause.

Brzycki returned to work from administrative leave on April 18. Her return to work was brief, however, because she was deeply distraught that O'Donohue had issued the Step C discipline. When she started having panic attacks at work, she saw health care provider Rachel Sternoff, ARNP, who placed Brzycki on medical leave beginning April 26 through July 1 for treatment for "increased anxiety, panic attacks, and elevated blood pressure associated with work."

Brzycki filed EEOC Charge No. 551-2017-01080 in April 2017, alleging discrimination on the basis of her race and national origin and retaliation for making complaints of discrimination. O'Donohue, Hare, and Balch received notice of the EEOC charge on April 27, 2017.

## G.   O'Donohue issues an unworkable part-time schedule as an "accommodation."

In late June, Sternoff released Brzycki to return to work on July 1 on a reduced schedule of twenty hours per week for two months. In the Family and Medical Leave Certification in which she requested the part-time schedule, Sternoff wrote that Brzycki "was having anxiety with panic attacks and elevated blood pressure associated with work stress. Anxiety has affected her work, sleep, blood pressure and quality of life." No one from the University reached out to Sternoff to seek clarifications regarding her request for a part-time schedule.

On June 30, O'Donohue emailed Brzycki a schedule that purported to satisfy the part-time 20 hour per week schedule Sternoff recommended. O'Donohue developed the schedule without any input from Brzycki.

Brzycki responded to O'Donohue's email in detail, copying Kim Francis, who was then

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

working as a Leave Representative and was therefore responsible for managing disability accommodations. Brzycki stated that she could not see six patients on a clinic day at a part-time schedule when she typically saw five patients on a clinic day while working full-time. She also requested advanced warning of meetings with managers and the presence of a Union representative at those meetings. Although Brzycki offered alternatives to the proposed schedule, O'Donohue flatly refused to consider Brzycki's request for changes. Instead, she declared that the proposed part-time schedule was "not up for negotiation." She removed Francis from her email responding to Brzycki.

Brzycki returned to work on July 5. O'Donohue repeatedly threatened Brzycki's job when she tried to raise concerns about her workload or her health. On July 11, Brzycki was unable to complete and document appointments with six patients within the five-hour workday. She worked over seven hours that day, contrary to the work restrictions placed by her medical provider.

The next day, July 12, O'Donohue directed Brzycki to cancel a pre-scheduled appointment with Stell and verbally threatened her with disciplinary action if she attended her appointment. On July 12, Stell placed Brzycki on medical leave due to her anxiety. Brzycki complained to Director of Medical Centers Human Resources Jennifer Petriz that O'Donohue's non-negotiable part-time schedule was retaliatory.

Petritz reached out to O'Donohue for information about how O'Donohue had developed the schedule. O'Donohue responded, describing to Petritz her purported justifications for the non-negotiable schedule. These "justifications" were based on improper considerations, incorrect assumptions, and falsehoods rather than on determining an effective accommodation for Ms. Brzycki. On July 19, Petritz emailed Brzycki and informed her that she had concluded that O'Donohue's schedule was "fair and reasonable." Brzycki responded and informed Petritz that she believed that O'Donohue had retaliated against her and "set her up for failure" by imposing the schedule.

PLAINTIFF'S TRIAL BRIEF - 12
CASE NO. 2:18-CV-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

**H.     Brzycki's resignation.**

On July 19, while on leave, Brzycki completed an intake interview with UCIRO investigator Alina McLauchlan regarding her complaints of discrimination and retaliation. UCIRO finally opted to proceed with an investigation. UCIRO notified O'Donohue and Hare of Brzycki's complaint on August 9.

On August 15, Brzycki attempted to return to work, but Hare sent her home. The next day, Brzycki filed EEOC Charge No. 551-2017-01858, alleging failure to accommodate, discrimination on the basis of disability, and retaliation for filing her May 2017 EEOC charge.

During summer and fall 2017, Brzycki applied for ARNP positions elsewhere in the UW Medicine system in an effort to remove herself from O'Donohue. Her attempts to transfer, however, stalled. As Defendants' witnesses have acknowledged, an employee's receipt of Step C Final Counseling discipline can prevent the employee from transferring to another department within UW Medicine.

In September, Brzycki received a conditional offer to work as an ARNP at the Veterans Affairs Puget Sound Healthcare System in Seattle. The offer was conditional on Brzycki's successful completion of a background check and credentialing process which could last several months. Although she wanted desperately to remain at Harborview, Brzycki feared further discrimination and retaliation and, therefore, tentatively accepted the VA's offer. While her credentialing with the VA was in process, Brzycki continued to work with Stell to submit multiple requests to Harborview for a transfer as an accommodation for her anxiety. Brzycki returned to work briefly in November 2017 but was again consumed by anxiety and returned to medical leave.

By mid-November, Harborview gave Brzycki notice that it would not offer her a transfer to another department as an accommodation. Upon learning Harborview's decision, Brzycki concluded that she had no other option to protect her health but to leave Harborview. Brzycki resigned her position at Harborview in late November 2017 and began working at the VA in January 2018.

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

# III.    ISSUES FOR TRIAL

**A.    The University discriminated against Brzycki on the basis of her race and/or national origin in violation of Title VII and the WLAD.**

In order to prevail at trial on her discrimination claim under Title VII, Brzycki must demonstrate, by a preponderance of the evidence, that her race and/or national origin was a motivating factor in the employer's decision to take an adverse employment action against her. Ninth Circuit Model Civil Jury Instruction No. 10.3. To prevail on her discrimination claim under the WLAD, Brzycki must demonstrate, by a preponderance of the evidence, that her race and/or national origin was a substantial factor motivating the employer's decision to take an adverse employment action against her. *Scrivener v. Clark College*, 181 Wn.2d 439, 446-47, 334 P.3d 541 (2014); Washington Pattern Jury Instructions—Civil § 330.01. Under both state and federal disparate treatment law, an adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment. *Davis v. Team Elec. Co.,* 520 F.3d 1080, 1089 (9th Cir. 2008); *Kirby v. City of Tacoma*, 124 Wn.App. 454, 98 P.3d 827 (2004).

Brzycki will prove at trial that the Step C Final Counseling was an adverse employment action for purposes of her discrimination claim. In connection with the Step C Final Counseling, Defendants imposed a detailed action plan which changed key aspects of her work conditions such as the amount of time allotted to prepare for and document patient visits, her work responsibilities, and the duration of her patient appointments.  The Step C discipline also limited Brzycki's ability to transfer to another department within UW Medicine.

 Brzycki will also prove that her race, her national origin, or a combination of the two were a substantial and motivating factor in the University's decision to impose the Step C Final Counseling. Employment decisions based on stereotypes constitute unlawful intentional discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989). A plaintiff need not prove that the employer had ill will or malice toward her protected class in order to prevail on a discrimination claim. *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1283-84 (11th Cir. 2000). Here, O'Donohue's experiences living and working in Haiti led her to adopt cultural references

PLAINTIFF'S TRIAL BRIEF - 14
CASE NO. 2:18-CV-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104–1798
(206) 682–6711

and stereotypes of Haitian women as cooks or servants, which are stereotypes against which she measured Brzycki's conduct as a Black and Haitian woman.  O'Donohue repeatedly asked Brzycki to cook for her and made comments relating to Brzycki's national origin.  When Brzycki refused to cook for O'Donohue and did not conform to O'Donohue's expectations, O'Donohue began to micromanage Brzycki and scrutinize her whereabouts. Rather than treat Brzycki as a professional and meet with her to discuss her concerns about Brzycki's work, O'Donohue assembled a dossier of information about Brzycki and initiated the investigation that led to the Step C discipline. As a result, the jury will find that O'Donohue's discriminatory intent influenced the investigation and the decision to impose serious discipline and was, as a result, a substantial and/or motivating factor in the University's decision to impose the Step C discipline.

**B.     The University retaliated against Brzycki for engaging in activity protected under Title VII and the WLAD.**

To establish a claim of retaliation under the WLAD, the plaintiff has the burden of showing that she engaged in a statutorily protected activity and that this was a substantial factor in the employer's decision to take an adverse employment action. *See* Washington Pattern Jury Instruction—Civil § 330.05. Under Title VII, she must prove that her protected activity was a but-for cause of the employer's decision to take an adverse action. *See* Ninth Circuit Model Civil Jury Instruction No. 10.08.  Under both state and federal law, a plaintiff may prove that she engaged in protected conduct if he or she had a reasonable belief that the facts complained about constituted an unlawful employment practice. *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir 1994) ("The reasonableness of [Plaintiff's] belief that an unlawful employment practice occurred must be assessed according to an objective standard - one that makes due allowance, moreover, for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims. We note again that a reasonable mistake may be one of fact or law"); *Estevez v. Faculty Club of Univ. of Wn.*, 129 Wn. App. 774, 798 (2005); *see also* WPI 330.05.

Here, Brzycki will prove that she repeatedly engaged in protected activity by making complaints of what she reasonably believed to be discrimination on the basis of her race and

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

national origin to her managers and UCIRO.  These complaints include her 2015 complaints regarding her then-manager Vicki Johnson's conduct; her November 2016 complaint that O'Donohue's conduct was prejudicial and bulling; her comments during the investigation meetings that she would not have been subjected to the intense investigation that led to the Step C discipline if she had not been Black; her February 14, 2017 email complaining that the investigation process was discriminatory; her filing of EEOC complaints alleging discrimination, retaliation, and failure to accommodate in April and August 2017; her July 19, 2017 email to Petritz; her UCIRO complaint; and her verbal complaints to her managers in the months following the issuance of the April 2017 Step C Final Counseling.

The evidence at trial will also show that Brzycki's managers repeatedly took adverse actions against her based on her protected activity. An adverse action in the context of a retaliation claim is one that a reasonable employee would have found materially adverse, which means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *See* Ninth Circuit Model Civil Jury Instruction No. 10.10; Washington Pattern Jury Instruction—Civil § 330.06. Here, the University conducted an investigation of Brzycki between November 2016 and April 2017 that did not follow usual processes for communication with the Union. In February 2017, the University placed Brzycki on paid administrative leave the day after she complained that the investigation was discriminatory. In April 2017, the University imposed the most severe form of discipline short of termination and imposed a strict action plan. In July 2017, O'Donohue imposed an impossible part-time schedule as a purported "accommodation," refused to engage in the interactive process with respect to that accommodation, and threatened Brzycki when she raised concerns about that schedule. The University's representatives took these actions in close temporal activity to Brzycki's protected activities. The jury will find that Brzycki's protected activities were a substantial factor in and a but-for cause of the University's decisions to take adverse actions against Brzycki.

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

**C.      Defendants failed to reasonably accommodate Ms. Brzycki's disabilities in July 2017 in violation of the WLAD.**

Under the WLAD, an employee is entitled to a reasonable accommodation if she (1) has "an impairment that is medically recognizable or diagnosable or exists as a record or history;" (2) the employee gave the employee "notice of the impairment" or "no notice was required to be given because the employer knew about the employee's impairment;" and (3) "the impairment had a substantially limiting effect on his ability to "perform his job" or "access equal benefits of employment." WPI 330.33. In such cases, if the employee "would have been able to perform the essential functions of the job in question with reasonable accommodation;" and the employer fails to reasonably accommodate the impairment, the company is liable for failure to accommodate. *See id.*

Here, there is no genuine dispute of fact that Brzycki was disabled within the meaning of the WLAD and that she placed the University on notice of her need for accommodation.  Her health care providers—Schuringa, Sternoff, and Stell—all informed the University that Brzycki suffered from anxiety that affected her ability to work.  Brzycki anticipates that she will ask the Court to instruct the jury that these elements of her failure to accommodate claim have been proven as a matter of law at the close of Defendants' evidence.

Further, Brzycki will prove at trial that the University failed to reasonably accommodate her by providing a reasonable clinic schedule in response to the concerns she expressed on June 30, 2017. Examples of reasonable accommodations include adjustments in job duties, work schedules, or scope of work.  WAC 162-22-065(2).  "As long as a reasonable accommodation available to the employer could have plausibly enabled a handicapped employee to adequately perform his job, an employer is liable for failing to attempt that accommodation." *Kimbro v. Atl. Richfield Co.*, 889 F.2d 869, 879 (9th Cir. 1989) (analyzing reasonable accommodation claim under the WLAD)). Here, the University flatly refused to engage in the interactive process to discuss reasonable accommodations for Brzycki's disability after Brzycki placed its employees on notice of her concerns about O'Donohue's schedule. The University could have reached out to

Brzycki to better understand her need for accommodations, and it could have reduced Brzycki's Tuesday clinic schedule and continued its practice of having the Neurology ARNPs cover a subset of the patients. Instead, O'Donohue and the University provided an unworkable schedule and set Brzycki up to fail.

The University is expected to argue at trial that it had no duty to accommodate Ms. Brzycki because she was unable to perform the essential functions of her position with or without reasonable accommodation. An essential function is "a job duty that is fundamental, basic, necessary and indispensable to filling a particular position, as opposed to a marginal duty divorced from the essence or substance of the job." *See* WPI 330.37. There is no real dispute that Brzycki would have been able to perform the essential functions of her position, including seeing stroke patients, attending rounds and meetings, attending to her clinical responsibilities, and participating in stroke education, if the University had met its duty to accommodate her disability.

**D.    Damages**

Brzycki will seeking an award at trial of general damages to compensate her for the significant emotional harms she suffered as a result of the discrimination and retaliation she experienced at Harborview. Brzycki's husband, her counselor and Bryzcki herself will provide testimony about the anguish, anxiety, embarrassment, emotional distress, fear, humiliation, injury to reputation, betrayal, personal indignity, and loss of enjoyment of life that she suffered at Harborview. The value of those damages is a question for the jury to decide based on evidence presented about the effects on her physical and mental health and her activities, along with the severity and duration of those effects. Brzycki is also seeking an award of back pay and lost benefits for the time periods when she had to go on unpaid medical leave after exhausting all of her paid medical leave as a direct result of Defendant's actions and unlawful treatment of her.

In addition, Brzycki will seek an award post-trial of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 12205, RCW 49.60, and RCW 49.48, in addition to prejudgment interest at the statutory rate. Finally, Brzycki intends to seek an award to adjust for the increased tax

PLAINTIFF'S TRIAL BRIEF - 18
CASE NO. 2:18-CV-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

liability she may incur due to any recovery of the above described damages pursuant to *Blaney v. Int'l Ass'n of Machinists & Aerospace Workers*, 151 Wn.2d 203, 87 P.3 757 (2004).

## IV.   ADDITIONAL PRE-TRIAL PROCEDURAL MATTERS

**A.   Plaintiff and her witnesses may testify about their reasonable inferences that O'Donohue (and others) were motivated by discrimination.**

Brzycki and her witnesses should be permitted to testify at trial about their reasonable inferences that the actions of O'Donohue and other University managers and employees were motivated by discrimination or by retaliation. Courts have admitted lay witness testimony regarding inferences of discrimination rationally drawn from the witness's perception. *See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir. 1997) (lay witness's testimony that he believed age discrimination was a factor in adverse employment action was rationally based on his perceptions that the employer preferred younger employees); *Gossett v. Oklahoma ex rel. Bd. Of Regents for Langston Univ.*, 245 F.3d 1172, 1179 (10th Cir. 2001) (affidavit of lay witness asserting adverse employment action was based on gender discrimination was improperly excluded because it was rationally based on her perceptions). Here, testimony by Brzycki and her witnesses regarding their reasonable inferences of discrimination and retaliation will be based on their own personal observations of the conduct of O'Donohue and other University employees. This testimony should be admitted.

**B.   The Court should exclude undisclosed expert opinions regarding Brzycki's endocrinologist records.**

Brzycki anticipates that the University will attempt to elicit testimony from its expert witness, Dr. Russell Vandenbelt, regarding records of Brzycki's treatment by her endocrinologist. This testimony should be excluded.  Federal Rule of Civil Procedure 26(a)(2)(A) requires that expert witnesses must either prepare a detailed written report under Rule 26(a)(2)(B) or, if not required to provide a written report, the party must disclose: "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify. If a party fails to

PLAINTIFF'S TRIAL BRIEF - 19
CASE NO. 2:18-CV-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

provide information required by Rule 26(a), the party is not allowed to use that information at trial, unless failure to provide the information was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1); *see Medvedeva v. Kirkland*, No. C14-7RSL, 2015 WL 11233200, at *1 (W.D. Wash. Aug. 21, 2015).

Here, Brzycki agreed to submit to a medical examination by Vandenbelt on September 17, 2019. Vandenbelt provided his expert report on October 9, 2019. On November 5, 2019, following the depositions of Brzycki's treating providers Sternoff and Schuringa, the University requested copies of records from Brzycki's endocrinologist.  Brzycki promptly requested the records and provided them to the University. Four months have now passed since Brzycki produced these records.  If University intended to have Vandenbelt testify regarding Brzycki's endocrinologist records, it had four months in which to supplement Vandenbelt's expert disclosure. It has not done so. It would be prejudicial to Brzycki to now allow Vandenbelt to testify at trial regarding the endocrinologist records.

Similarly, the University should not be permitted to elicit testimony from Brzycki's treating providers Schuringa and Sternoff regarding the endocrinologist records. A treating provider cannot testify about matters beyond her personal knowledge or about opinions that were not formed during the course of treatment without first providing an expert report under Rule 26(a)(2). *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011). Because the treating providers did not review Brzycki's endocrinologist records at the time of treatment and did not provide an expert report, testimony about those records should be excluded.

## V.    CONCLUSION

The evidence at trial will show that the University discriminated against Brzycki on the basis of her race and/or national origin in violation of Title VII and the WLAD; retaliated against her in violation of Title VII and the WLAD, and failed to accommodate her in violation of the WLAD.  Brzycki values this opportunity to appear before this Court, to have the evidence fairly evaluated, and to have a just outcome reached by the jury.

PLAINTIFF'S TRIAL BRIEF - 20
CASE NO. 2:18-CV-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

1

DATED this 8th day of April, 2020.

2

                    FRANK FREED SUBIT & THOMAS LLP

3

                    */s/ Christie J. Fix*

4

                    Christie J. Fix, WSBA # 40801

5

                    */s/ Sean M. Phelan*

6

                    Sean M. Phelan, WSBA # 27866
                    Suite 1200 Hoge Building

7

                    705 Second Avenue
                    Seattle, WA  98104

8

                    Telephone: (206) 682-6711
                    Facsimile: (206) 682-0401

9

                    Email: cfix@frankfreed.com
                                sphelan@frankfreed.com

10

11

                    Attorneys for Plaintiff Marthilde Brzycki

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFF'S TRIAL BRIEF - 21
CASE NO. 2:18-CV-01582-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 8, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel/parties of record. I hereby certify that no other parties are to receive notice.

DATED at Seattle, Washington on this 8th day of April, 2020.

*/s/Sarah Gunderson*_____
Sarah Gunderson

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711