UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARTHILDE BRZYCKI, | CASE NO. C18-1582 CKJ |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| UNIVERSITY OF WASHINGTON, | |
| Defendant. | |

This matter was tried to the Court without a jury in November 2020, before visiting Senior United States District Court Judge Cindy K. Jorgenson.  Plaintiff Marthilde Brzycki proceeded pro se at trial.  Plaintiff presented five claims to the Court: (i) disparate treatment under Title VII of the Civil Rights Act of 1964; (ii) retaliation under Title VII of the Civil Rights Act of 1964; (iii) disparate treatment under the Washington Law Against Discrimination; (iv) retaliation under the Washington Law Against Discrimination; and (v) failure to reasonably accommodate under the Washington Law Against Discrimination.  Defendant University of Washington was represented by Seth Berntsen and Hathaway Burden of the Summit Law Group.  The Court, having considered

the evidence before it, including the testimony of witnesses and the documents and exhibits which were admitted during trial, having heard argument and considered the briefs and memoranda of Plaintiff and counsel, makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT[1]

To the extent these findings of fact are also deemed to be conclusions of law, they are incorporated into the conclusions that follow.  Based on the evidence presented at trial, the Court makes the following findings of fact:

1.     The Court heard testimony from the following witnesses at trial: William Brzycki (Plaintiff's husband), Tammie English (Stroke Resource Nurse), Anna Krumpe (Nurse Practitioner), Nola Balch (Human Resources Consultant), Dr. David Tirschwell (Medical Director of Comprehensive Stroke Care), Dr. Rizwan Kalani (Research Fellow), Tracy Ezell (Patient Care Core Administrator), Susan Guse (Administrative Assistant, Neurology Department), Dakota Johnson (Certified Medical Assistant), Sabrina Snow (Diagnostic Technician/Union Organizer), Plaintiff Marthilde Brzycki (former Health Care Specialist), Reid Stell (Licensed Mental Health Counselor), Lilia Merveus (Plaintiff's friend/Harborview employee), Vicki Johnson (former Stroke Program Manager), Kathy Hare (Assistant Administrator, Patient Care Services), Kim Francis (Leave Specialist), Kelly Paananen (Director of Health Care Specialists), Dr. Kyra Becker (retired Director of Stroke Clinic), Tricia O'Donohue (former Stroke Program Manager), and Alina McLauchlan (Investigator, UCIRO).  Pursuant to stipulation, the Court also reviewed the perpetuation deposition testimony of Beth Louie (Investigator, UCIRO), Abebe Tesfamariam

---

[1] Under Federal Rule of Civil Procedure 52(a), courts are not required to prepare elaborate findings on every possible issue or contention raised at trial, *Deal v. Cincinnati Bd. of Ed.*, 369 F.2d 55, 64-65 (6th Cir. 1966); rather, "[t]he findings should be explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision," *Alpha Distrib. Co. v. Jack Daniel Distillery*, 454 F.2d 442, 453 (9th Cir. 1972).

(former Director of Nursing-Procedural Areas), and Jennifer Petritz (Director of Employee Relations) in lieu of live testimony.

2.      Plaintiff is a black woman who was born in Haiti and moved to the United States when she was eleven years old.  During the timeframe in question, Defendant was aware of Plaintiff's race and national origin.

3.      In 2014, Plaintiff became a licensed advanced nurse practitioner.  Prior to becoming a licensed advanced nurse practitioner, Plaintiff was a licensed registered nurse.

4.      In January 2015, Plaintiff began work as a Health Care Specialist ("HCS") in the Stroke Center of Harborview Medical Center.  Harborview Medical Center is owed by King County, Washington, and is managed by the University of Washington.  An interchangeable title for Health Care Specialist is an Advanced Registered Nurse Practitioner or "ARNP."

5.      As an HCS working in the Stroke Center, Plaintiff was charged with seeing patients in an outpatient clinical setting, examining those patients, reviewing their medical histories, prescribing medication, or ordering necessary imaging or lab work, and transcribing patient notes after each patient visit.

6.      On August 23, 2016, Tricia O'Donohue was hired as the new Stroke Program Manager.  Plaintiff reported directly to Ms. O'Donohue.  Upon hire, Ms. O'Donohue was tasked with clarifying the roles and responsibilities of the employees in the stroke center.  She was also tasked with holding stroke center employees accountable for their duties and performance.  In attempting to hold Plaintiff accountable for her duties and performance, friction developed between Ms. O'Donohue and Plaintiff and problems arose.

7.      In October 2016, confounded as to what Plaintiff was doing while at work, Ms. O'Donohue requested that Plaintiff refrain from working overtime. She also requested that

1    Plaintiff adjust her hours during the week so that she would not accrue overtime.  During that

2    month, Ms. O'Donohue also noticed that Plaintiff could not be found on the premises even though

3    Plaintiff was clocked into the time management system.  She also discovered that Plaintiff was not

4    attending rounds with the physicians as required.

5         8.    On November 1, 2016, Ms. O'Donohue discovered that Plaintiff had lied to her

6    about attending rounds that day.  The same day, Ms. O'Donohue met with Nola Balch, a Human

7    Resources Consultant, to discuss problems with Plaintiff's performance and time keeping.  At the

8    meeting, Ms. Balch suggested that Harborview hold an investigatory meeting to establish a factual

9    record regarding Ms. O'Donohue's concerns.

10        9.    Around this time, Plaintiff was frustrated with a lack of clarity concerning her role

11   in the stroke center and what she interpreted to be micro-managing by Ms. O'Donohue.  On

12   November 3, 2016, Plaintiff sent an email to Ms. O'Donohue's boss, Kathy Hare, complaining

13   that Ms. O'Donohue needed clarification of Plaintiff's role.  In the message, Plaintiff questioned

14   whether she was still in charge of managing her own daily routine.  Plaintiff complained that she

15   did not have time to attend rounds or participate in some of the meetings that she was required to

16   attend.  Plaintiff also complained that she was no longer permitted to work overtime.  Plaintiff

17   concluded the correspondence by asking for a meeting with Ms. Hare.

18        10.   The day following Plaintiff's email to Ms. Hare, Ms. O'Donohue discovered

19   another incident where Plaintiff claimed she had attended physician rounds and had not.  Shortly

20   thereafter, Ms. O'Donohue brought Plaintiff's failure to attend physician rounds to the attention

21   of senior management.

22        11.   On November 14, 2016, still confused as to who was in charge of her schedule and

23   unsure of her role, Plaintiff sent an email to Kelly Paananen, the Director of Health Care

24

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4

Specialists, complaining that her new supervisor was requiring her to perform duties outside of her role as a nurse practitioner.  In the message, Plaintiff included a two-page document that outlined what she believed to be her job duties.  Plaintiff concluded the message by stating:

> Please help me. This is not the first challenge I have had with my schedule and a manager limiting my ability to care for patients and generate revenue for the center. This is very stressful for me and I am simply looking for help to allow me to perform my duties. Tricia has never been a manager before, I think she means well, but just does not understand what my role as a provider is.

Ex. #20.  The same day, Ms. O'Donohue reported to a human resources consultant and Ms. Hare that Plaintiff was trying to undermine steps that she was taking to improve the Stroke Clinic.

12.    Two days later, Plaintiff sent an email to Ms. O'Donohue outlining the departmental meetings that Plaintiff thought she needed to attend.  Plaintiff wrote that she would be happy to attend other meetings only when her schedule and job duties permitted.  Plaintiff concluded the correspondence by informing her new supervisor that she would take Ms. O'Donohue's suggestion about her attendance at mandatory meetings "under advisement."

13.    The following day, Ms. O'Donohue informed Plaintiff that an investigatory meeting would be held in the beginning of December to discuss discrepancies in Plaintiff's attendance and hours of work and to discuss concerns with her performance.  Ms. O'Donohue, Ms. Paananen, Ms. Balch, and representatives from the University of Washington internal audit division were to attend the meeting.  Plaintiff's awareness of the meeting spurred a flurry of internal and external complaints of discrimination and harassment.

14.    On November 18, 2016, Plaintiff sent an email to members of senior management, including Ms. Hare, complaining of prejudice, bullying, harassment, and mistreatment by Ms. O'Donohue.  The email stated, in pertinent part:

> I enjoy doing my job as a provider and my duties are very clear and simple to understand – which makes my performing my job easy even under extreme prejudice, stress, and bullying from managers.
>
> . . . .
>
> Now I have a manager who I actually like, but who started to continuously to [sic] treat me like a child, scolding me with a warning for not answering my pager during rounds on two occasion[s], treating me as if I don't know how to perform my duties as ARNP, treating me as a secretary and stroke resource RN, and bullying me – because I missed ONE meeting and disagree with my being needed in another one that is primarily for the Unit nurse managers.

Ex. # 23.  Upon receipt of the message, Ms. Hare, the Assistant Administrator of Patient Care Services, forwarded Plaintiff's email to Ms. Balch, who in turn, directed Kim Francis, another human resources consultant, to investigate the allegations in the email.  Ms. Hare also informed Plaintiff that she had forwarded Plaintiff's concerns to the Human Resources Department. Ms. O'Donohue testified that Ms. Francis interviewed her about Plaintiff's November complaint in mid-December.

15.     Also on November 18, 2016, Plaintiff sent an email to the University Complaint Investigation and Resolution Office ("UCIRO") complaining of bullying and discrimination by management.  The email stated, in pertinent part:

> I believe that my role as a provider should have be [sic] explained to [Ms. O'Donohue] by administration and the stroke center directors, and not just by me. This would have probably increase [sic] her understanding, decrease the prejudice, the stress she afflicting on me, and the bullying. I feel that this behavior is discriminatory towards me.

Ex. #24.

16.     On December 5, 2016, Ms. O'Donohue, Ms. Balch, and members of the University of Washington internal audit division conducted the first part of Plaintiff's investigatory meeting. At the meeting, a large number of serious performance concerns were brought to Plaintiff's attention, including clocking in while commuting to work, working a high number of unapproved

1    hours of overtime, and failing to attend mandatory physician rounds.  With additional concerns

2    left to address, the meeting was continued to a future date.

3         17.    The following day, Plaintiff emailed Ms. O'Donohue and members of senior

4    management explaining that she was anxious and overwhelmed and needed to take a sick day.

5         18.    On December 8, 2016, Defendant received a formal leave request from Plaintiff's

6    healthcare provider.  The request indicated that Plaintiff was experiencing increased anxiety with

7    panic disorder and that she needed time off to reduce stress.  The request also indicated that

8    Plaintiff's provider had treated Plaintiff for her health condition on November 14, 2016, and

9    December 7, 2016.  Plaintiff's leave request was approved, and Plaintiff returned to work two

10   months later.

11        19.    On January 11, 2017, Ms. Francis, the human resources consultant responsible for

12   investigating Plaintiff's November 18, 2016 internal complaint, sent a letter to Plaintiff informing

13   Plaintiff that she was unable to substantiate Plaintiff's allegations of harassment.

14        20.    On February 2, 2017, Plaintiff returned to work from her leave of absence.  Despite

15   Plaintiff's two-month leave due to anxiety and panic disorder, Plaintiff was required to meet with

16   Ms. O'Donohue and Ms. Paananen to discuss performance expectations that day.  During the

17   meeting, it was explained to Plaintiff that she would no longer be permitted to find quiet spaces

18   around the hospital to work, but that she would need to work from her office in the stroke center.

19   Later that day, Plaintiff contacted the Medical Director of Comprehensive Stroke Care and

20   informed him that she would be submitting her two-week notice of resignation.  Plaintiff ultimately

21   failed to submit the notice.

22

23

24

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 7

21.     Five days after Plaintiff's meeting with Ms. O'Donohue and Ms. Paananen, Ms. O'Donohue sent an email to Ms. Balch and Ms. Paananen reporting that Plaintiff had failed to timely complete notes on two of her patients, as previously instructed.

22.     On February 13, 2017, the second part of Plaintiff's investigatory meeting was held. Present at the meeting were Plaintiff, Ms. O'Donohue, Ms. Balch, and members of the University of Washington internal audit division.   The topics of discussion included Plaintiff's use of an encrypted USB drive to store patient information and Plaintiff's concession that she often worked off the clock—including nights and weekends.   During the meeting, management also questioned Plaintiff concerning a large number of instances when Plaintiff prematurely logged into the time-management system while off the premises.   With additional concerns left to address, the meeting was again continued to a future date.

23.     The day after Plaintiff's second investigatory meeting, Plaintiff sent an inflammatory email to Ms. O'Donohue, members of senior management, and unrelated internal healthcare providers.   The email stated, in part:

> The hours . . . that you're claiming I stole from UWMC were lies! . . . [I]nstead of trying to destroy my license, my practice, and my reputation by accusing me of theft of hours, and being a bad employee[,] [t]here are more respectable, less discriminatory ways to tell someone that they're not wanted in a department.

Ex. #35.  Later that day, a member of senior management notified Plaintiff that she was being placed on paid administrative leave pending the outcome of its continued investigation into workplace misconduct.

24.     Two days later, with Plaintiff out on administrative leave, the third part of her investigatory meeting was held.  Present at the meeting were Plaintiff, Ms. O'Donohue, Ms. Balch, and Ms. Paananen.  Topics of discussion included concerns with Plaintiff's communication style, time management skills, and ability to handle direction and feedback.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 8

25.    On April 7, 2017, Ms. Balch provided Plaintiff with the findings of Defendant's three-part investigatory meeting via email.  Ms. Balch explained to Plaintiff that she would receive Step C Final Counseling and a corresponding action plan.  The Step C Final Counseling was one step below termination.

26.    The investigatory findings included discrepancies with Plaintiff's time and attendance, an ongoing failure to perform assigned work duties, examples of unprofessional work conduct, and Plaintiff's repeated use of ineffective methods of communication.  As part of Plaintiff's Final Counseling, Defendant implemented an action plan which informed Plaintiff that she was forbidden from working remotely, she had to attend physician rounds during the week, she had to return to her office immediately after rounds, she had to complete Friday patient notes by the end of the day Friday, Tuesday patient notes had to be completed by the end of the day on Wednesday, and Plaintiff had to attend two University-sponsored classes, among other corrective measures.  The presence of Step C Final Counseling on Plaintiff's disciplinary record prevented Plaintiff from transferring to another department within the University system.

27.    On April 26, 2017, Plaintiff requested a second leave of absence due to increased anxiety, elevated blood pressure, and work-related stress.  Plaintiff's leave request was again approved.  Plaintiff returned to work on July 5, 2017.

28.    Before Plaintiff returned to work from her second leave of absence, Plaintiff's primary care provider informed Defendant that Plaintiff could return to work on a reduced work schedule of 20 hours per week for two months.  The provider indicated that Plaintiff was experiencing continued anxiety with panic attacks and elevated blood pressure associated with work stress.  The provider also indicated that Plaintiff's anxiety had affected her work, sleep, blood pressure, and quality of life.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9

29.     On June 30, 2017, Ms. O'Donohue sent Plaintiff an email acknowledging receipt of her provider's request and in anticipation of Plaintiff returning to work in a few days.  Attached to the email, Ms. O'Donohue included a predetermined schedule that accommodated Plaintiff's request to work a 20-hour week.  Among other items, the schedule indicated that Plaintiff was to meet with Ms. O'Donohue and Ms. Paananen on July 5, 2017, from 9:00 a.m. to 10:00 a.m. Further details concerning the meeting were not included.

30.     At 7:28 p.m. the same day, Plaintiff sent an email to Ms. O'Donohue and members of senior management which stated that she could not handle working part-time and seeing 6 patients on a clinic day, which was more than her usual load at the time.  Plaintiff suggested a modified schedule reducing the number of total patients scheduled from 9 to 7 patients per week, and she indicated that she could see 3 to 4 patients on Tuesdays and 2 to 3 patients on Fridays, giving her time to attend mandatory meetings.  Plaintiff also requested advanced warning of any future meetings with Ms. O'Donohue and Ms. Paananen and union representation during any private meeting with Ms. O'Donohue or any other member of management.

31.     At 9:34 p.m. the same day, Ms. O'Donohue replied to Plaintiff's message, stating, in part:

> This schedule/workflow is not up for negotiation, though as ever, if you run into challenges in meeting the work expectations you should come to me right away so that we can engage in a problem solving discussion to review workflow, priorities and strategies . . . . Lastly, as you see on the schedule, I have scheduled one meeting between yourself, Kelly and I, to touch base after your extended absence.

Ex. #49.

32.     On July 5, 2017, Plaintiff returned to work and failed to attend her previously scheduled meeting with Ms. O'Donohue and Ms. Paananen.

33.     On July 11, 2017, Ms. O'Donohue informed Plaintiff via email that she had scheduled a meeting for the following day to review Plaintiff's action plan, discuss areas where Plaintiff failed to meet expectations as outlined in the plan, and to review Plaintiff's modified schedule with Plaintiff and Ms. Paananen.  Ms. O'Donohue indicated that she had also invited representatives from human resources and UW Labor Relations to attend the meeting as well.

34.     On July 12, 2017, Plaintiff failed to attend the meeting with Ms. O'Donohue, Ms. Paananen, and others.  However, earlier that morning, Plaintiff sent an email to Jennifer Petritz, Director of Employee Relations, reporting that Ms. O'Donohue changed her schedule without first consulting her, which caused her to work two hours later than scheduled the night before.  Plaintiff added that she was struggling with Ms. O'Donohue changing her schedule and that by overfilling her schedule, her license, health, and patient safety were put in jeopardy.  Later that day, Plaintiff's therapist submitted a disability accommodation leave request on her behalf.  Plaintiff's leave request was approved, and Plaintiff briefly returned to work approximately four months later.

35.     On July 18, 2017, with Plaintiff out on leave, Ms. Petritz responded to Plaintiff's earlier email by concluding that Plaintiff's new 20-hour schedule was "fair and reasonable."  Ms. Petritz indicated that historical data was reviewed concerning patient schedule patterns to determine the appropriateness of the revised schedule, the schedule reflected the number of patients that were to be seen by other nurse practitioners in Plaintiff's absence, and that the schedule was reviewed and approved by senior management prior to dissemination.

36.     On August 16, 2017, Plaintiff filed a discrimination charge with the Washington State Human Rights Commission and the EEOC outlining claims of failure to accommodate her disability and retaliation.

37.     On November 27, 2017, Plaintiff resigned from her position at Harborview.

1        Witness Testimony and Credibility

2        The majority of relevant facts in this case were uncontested at trial.  As such, the Court

3    finds it necessary to include its credibility determinations only as to relevant contested facts.  The

4    primary contested fact was whether Ms. O'Donohue treated Plaintiff differently because of

5    Plaintiff's race or national origin.  To demonstrate that Ms. O'Donohue treated her differently

6    based on her protected characteristics, Plaintiff relied on allegations that Ms. O'Donohue requested

7    that she cook Haitian food for her on several occasions while at work.

8        38.    Plaintiff testified that, on multiple occasions, Ms. O'Donohue asked Plaintiff to

9    prepare Haitian food for her. Plaintiff offered this testimony as evidence of disparate treatment

10   discrimination. Plaintiff, however, failed to corroborate her allegations with any documentary

11   evidence, including emails, internal complaints, or her own contemporaneous notes concerning

12   Defendant's alleged discriminatory behavior. The preponderance of evidence presented at trial

13   demonstrated that Plaintiff received Step C Final Counseling and a corresponding action plan due

14   to serious performance issues rather than discrimination and retaliation.  The Court finds that

15   Plaintiff's misconstrued beliefs, alone, are insufficient evidence of employment discrimination.

16       39.    The Court did hear evidence from one witness, Susan Guse, a former administrative

17   assistant in the neurology department at Harborview, who testified that she overheard Ms.

18   O'Donohue ask Plaintiff to make her Haitian food on at least two occasions.  The Court, however,

19   fails to find Ms. Guse credible, as she was quick to volunteer unrelated derogatory information

20   about defense witnesses, frequently strayed off topic, and offered questionable witness testimony

21   for someone who had been retired from the workplace for four years and only occasionally visited

22   the area of Plaintiff's office, which Plaintiff testified she did her best to avoid.

23

24

40.   Ms. O'Donohue testified at trial that she never requested that Plaintiff, nor anyone else for that matter, prepare for her Haitian food.  Ms. O'Donohue also testified that she had lived and worked in Haiti, "loved it", and married a black Haitian man.  Ms. O'Donohue's testimony was balanced, thoughtful, responsive, and sincere.  The Court finds her testimony concerning Plaintiff's disparate treatment and retaliation claims—and in general—to be credible.

41.   The Court also heard testimony from two of the medical directors of the Stroke Clinic at Harborview, Dr. Tirschwell and Dr. Becker.  Both doctors testified that they had serious concerns with Plaintiff's work performance, including her ability to efficiently record relevant patient notes, her ability to demonstrate knowledge of stroke-related issues, and her continued refusal to attend mandatory didactic conferences, stroke lectures, and physician rounds.  The doctors also expressed concern with some of Plaintiff's treatment decisions and her overall lack of engagement with the stroke clinic team.  As it concerned Ms. O'Donohue and her management of Plaintiff, the doctors testified that Ms. O'Donohue was an effective manager and a fantastic colleague, that she was fair and honest, and that she got the job done.  The Court finds that the testimony of Drs. Tirschwell and Becker was credible and that it played an instrumental role in clarifying the contested facts at trial.

1

## CONCLUSIONS OF LAW

2      To the extent these conclusions of law include additional findings of fact, those findings

3 are incorporated into the preceding paragraphs.   Pursuant to its findings of fact, the Court

4 concludes as follows:

5      42.      The burden of proof, by a preponderance of the evidence, rests with Plaintiff.

6      **A.      Disparate Treatment under Title VII of the Civil Rights Act of 1964**

7      43.      Plaintiff's Title VII claims are analyzed through the burden-shifting framework

8 outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   "The *McDonnell*

9 *Douglas* analysis imposes on the plaintiff an initial burden of establishing a prima facie case of

10 discrimination." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).  To establish

11 a prima facie case of discrimination, a plaintiff must show that: "(1) she is a member of a protected

12 class; (2) she performed her job satisfactorily, was qualified, and met the legitimate expectations

13 of her employer; (3) she suffered an adverse employment action; and (4) the defendant-employer

14 treated her differently from a similarly situated employee who does not belong to the same

15 protected class." *McDaniels v. Grp. Health Co-op.*, 57 F. Supp. 3d 1300, 1310 (W.D. Wash.

16 2014).   "As an alternative to comparator evidence, the plaintiff can provide evidence of 'other

17 circumstances surrounding the adverse employment action [that] give rise to an inference of

18 discrimination.'"   *Id.* (citation omitted).   If the plaintiff establishes a prima facie case of

19 discrimination, the burden of production shifts to the defendant to articulate some legitimate,

20 nondiscriminatory reason for the challenged action.  *Chuang v. Univ. of Cal. David, Bd. of Trs.*,

21 225 F.3d 1115, 1123-24 (9th Cir. 2000).

22      44.      The Court concludes that Plaintiff failed to establish a prima facie case of

23 discrimination at trial, as she failed to prove that she performed her job satisfactorily and met the

24

legitimate expectations of her employer.  Plaintiff also failed to prove that Defendant treated her differently from a similarly situated employee who did not belong to the same protected class. Alternatively, Plaintiff failed to provide sufficient evidence of other circumstances surrounding the adverse employment action that give rise to an inference of discrimination.

45.     As it concerns the *McDonnell Douglas* framework, the Court finds that Plaintiff proved that she is a member of a protected class, as she is a native of Haiti and a black woman.

46.     Plaintiff failed to prove, however, that she was performing her job satisfactorily and was meeting her employer's legitimate expectations when she suffered an adverse employment action.

47.     Defendant proffered credible evidence at trial that Plaintiff demonstrated serious and repeated performance issues throughout her relatively short term of employment, which included clocking into the time management system while off the premises, failing to work collaboratively in a team environment, failing to document patient notes in a timely manner, failing to record concise and effective patient notes, failing to attend mandatory physician rounds, failing to accept constructive criticism, and demonstrating repeated instances of insubordination.

48.     While Plaintiff failed to prove that she was adequately performing her job at the time she suffered an adverse employment action, she was able to prove that she suffered an adverse employment action within the broad interpretation of that term.

49.     The Ninth Circuit has reiterated that an action constitutes an adverse employment action if it materially affects an employee's "compensation, terms, conditions, or privileges of employment." *Chuang*, 225 F.3d at 1126 (quoting 42 U.S.C. § 2000e-2(a)(1)).  The court interprets adverse employment action broadly, *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir.

1    2000), and observes that "assigning more, or more burdensome, work responsibilities, is an

2    adverse employment action," *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).

3        50.    At trial, it was uncontested that Plaintiff was subject to Step C Final Counseling

4    and a corresponding action plan.  The Court finds that the cumulative effect of the mandates

5    outlined in the action plan constituted an adverse employment action.  Those mandates required

6    Plaintiff to complete patient notes, in some instances, before the end of the day; to receive

7    managerial approval before working overtime; and to work in her office when not assisting with

8    patients or attending physician rounds.  Plaintiff proffered witness testimony at trial that other

9    employees were not bound by the same limitations and that the Step C Final Counseling prevented

10    her ability to transfer within the UW system.  The Court finds these requirements altered the

11    conditions and privileges of Plaintiff's employment and were equivalent to assigning Plaintiff

12    more burdensome work responsibilities.

13        51.    While Plaintiff proved that she suffered an adverse employment action under Title

14    VII, she failed to prove that similarly situated individuals outside her protected class were treated

15    more favorably.

16        52.    In defining "similarly situated individuals," the Ninth Circuit has instructed that

17    "individuals are similarly situated when they have similar jobs and display similar conduct."

18    *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003), *as amended* (Jan. 2, 2004).

19    Whether two employees are similarly situated is ordinarily a question of fact.  *Beck v. United Food*

20    *& Com. Workers Union Loc. 99*, 506 F.3d 874, 885 n.5 (9th Cir. 2007).  The employees' roles need

21    not be identical, but they must be similar "in all material respects."  *Hawn v. Exec. Jet Mgmt., Inc.*,

22    615 F.3d 1151, 1157 (9th Cir. 2010).  "Although material characteristics vary from case to case,

23    in termination and discipline cases, the Ninth Circuit looks to factors such as whether the proposed

24

comparator and the plaintiff were subject to the same policies, worked at the same jobs, committed similar violations, and had similar disciplinary records." *McDaniels v. Grp. Health Co-op.*, 57 F. Supp. 3d 1300, 1311 (W.D. Wash. 2014).  In *Collins v. Potter*, for example, the Ninth Circuit found that a proposed comparator was not similarly situated because she was not subject to a Last Chance Employment Agreement and had no record of dishonesty or insubordination.  431 F. App'x 599, 600 (9th Cir. 2011).

53.     At trial, Plaintiff failed to present evidence that a similarly situated employee had a disciplinary history or record similar to hers.  The Court heard testimony from nurse practitioner Anna Krumpe, but Plaintiff failed to adduce evidence that Ms. Krumpe had any disciplinary problems during her twenty-two-year tenure at Harborview.  Plaintiff's remaining witnesses, regardless of their disciplinary history, were not suitable comparators as they were not nurse practitioners who had similar roles in all material respects to Plaintiff.

54.     Alternatively, Plaintiff also failed to provide sufficient evidence of other circumstances surrounding the adverse employment action which gave rise to an inference of discrimination.

55.     At trial, Plaintiff argued that Defendant subjected her to Step C Final Counseling because of her race and national origin.  Plaintiff failed, however, to provide any evidence that leads the Court to draw the reasonable inference that the Step C Counseling was due to her race or national origin.  In fact, the Court credits Defendant's demonstration that Plaintiff's complaints, both internal and external, addressing discrimination and harassment occurred only *after* she became aware that an investigatory interview into her substandard work performance had been scheduled.  Moreover, the Court declines to draw an inference of discrimination since Defendant effectively demonstrated that Ms. O'Donohue, the person against whom Plaintiff based the

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 17

1  majority of her claims, had lived and worked in Haiti, testified she "loved it", and married a black

2  Haitian man.   The Court finds Ms. O'Donohue's testimony credible, as there was evidence

3  presented at trial which demonstrated that she acted in an appropriate and professional manner

4  when disciplining Plaintiff.

5        56.    Accordingly, Plaintiff's disparate treatment claim under Title VII fails and the

6  Court finds in favor of Defendant on this claim.

7        **B.**     **Disparate Treatment under the Washington Law Against Discrimination**

8        57.    The Washington Law Against Discrimination ("WLAD") makes it unlawful for an

9  employer to discriminate against any person in compensation or in other terms or conditions of

10  employment because of race or national origin. *Blackburn v. State*, 375 P.3d 1076, 1080

11  (Wash. 2016); WASH. REV. CODE ANN. § 49.60.180(3) (West 2020).   "Because intentional

12  discrimination is difficult to prove, [Washington courts] have adopted the evidentiary burden-

13  shifting scheme announced in *McDonnell Douglas*." *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas*

14  *Cnty.*, 404 P.3d 464, 526 (Wash. 2017).   To establish a prima facie case of disparate treatment

15  under the WLAD, "a plaintiff must show that (1) she is a member of a protected class; (2) she

16  performed her job satisfactorily, was qualified, and met the legitimate expectations of her

17  employer; (3) she suffered an adverse employment action; and (4) the defendant-employer treated

18  her differently from a similarly situated employee who does not belong to the same protected

19  class." *McDaniels,* 57 F. Supp. 3d at 1310.   "As an alternative to comparator evidence, the plaintiff

20  can provide evidence of 'other circumstances surrounding the adverse employment action [that]

21  give rise to an inference of discrimination.'"   *Id*. (citation omitted).   "Even though almost all of

22  the WLAD's prohibitions predate Title VII's, the ADA's, and the ADEA's, Washington courts still

23

24

look to federal case law interpreting those statutes to guide [their] interpretation of the WLAD." *Kumar v. Gate Gourmet Inc.*, 325 P.3d 193, 197 (Wash. 2014).

58.   In analyzing Plaintiff's disparate treatment claim under the WLAD, the Court concludes that Plaintiff failed to establish a prima facie case of discrimination, as she failed to present sufficient evidence of a suitable comparator or evidence of other circumstances surrounding the adverse employment action that give rise to an inference of discrimination.

59.   As previously mentioned, the fact that Plaintiff belongs to a protected class was uncontested at trial.  The Court also concluded that Plaintiff was subject to an adverse employment action under federal law.  While Plaintiff proved that she belongs to a protected class and suffered an adverse employment action, she failed to provide evidence of a similarly situated comparator.

60.   District courts have used Title VII's "similarly situated" test in analyzing disparate treatment under the WLAD.  In *McDaniels v. Group Health Co-op.*, a case where the district court analyzed the plaintiff's WLAD and Title VII disparate treatment claims under the same guidelines, the court reiterated that "[a]lthough material characteristics vary from case to case, in termination and discipline cases, the Ninth Circuit looks to factors such as whether the proposed comparator and the plaintiff were subject to the same policies, worked at the same jobs, committed similar violations, and had similar disciplinary records."  57 F. Supp. 3d 1300, 1311 (W.D. Wash. 2014).

61.   In its analysis of Plaintiff's federal disparate treatment claim, the Court found that Plaintiff failed to present sufficient evidence that Ms. Krumpe, presumably Plaintiff's closest comparator, had any disciplinary problems, including instances of dishonesty or insubordination, during her twenty-two years of employment.  The Court reiterates that finding here.

62.   Plaintiff's failure to provide evidence of a similarly situated comparator at trial means that she failed to satisfy the fourth prong of her prima facie case.  As an alternative to

comparator evidence, Plaintiff could have offered other evidence surrounding the adverse employment action that gave rise to an inference of discrimination. However, as the Court concluded in its disparate treatment analysis under federal law, Plaintiff failed to provide sufficient evidence of other circumstances surrounding the adverse employment action which gave rise to an inference of discrimination. The Court repeats that finding here.

63. Accordingly, Plaintiff's disparate treatment claim under the WLAD fails, and the Court finds in favor of Defendant on this claim.

## C. Retaliation under Title VII of the Civil Rights Act of 1964

64. Title VII prohibits employers from discriminating against an employee because that employee has opposed any practice made an unlawful employment practice by Title VII, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. *Henderson*, 217 F.3d at 1240. To make a prima facie case of retaliation under Title VII, an employee must demonstrate that: (i) she engaged in a protected activity; (ii) her employer subjected her to an adverse employment action; and (iii) a causal link exists between the protected activity and the adverse action. *Id.*; *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994). Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision. *Henderson*, 217 F.3d at 1240. If a defendant articulates such a reason, the plaintiff bears the burden of demonstrating that the reason was merely pretext for a discriminatory motive. *Id.*

65. In analyzing Plaintiff's Title VII retaliation claim, the Court concludes that Plaintiff failed to establish a prima facie case, as she was unable to demonstrate a causal link between her protected activity and the adverse action at trial.

66.     In making this determination, the Court finds that Plaintiff proffered sufficient evidence which demonstrated that she engaged in protected activity.

67.     The Ninth Circuit advises that "[a]n employee engages in protected activity when she opposes an employment practice that either violates Title VII or that the employee reasonably believes violates that law." *Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013). In *Moyo v. Gomez*, the court clarified this rule, explaining:

> It is not necessary . . . that the employment practice actually be unlawful; . . . An erroneous belief that an employer engaged in an unlawful employment practice is *reasonable,* and thus actionable . . . , if premised on a mistake made in good faith. A good-faith mistake may be one of fact or of law.

40 F.3d 982, 984 (9th Cir. 1994). The court has also instructed that "[m]aking an informal complaint to a supervisor" constitutes protected activity. *Henderson*, 217 F.3d at 1240, n.3.

68.     Following the Ninth Circuit's guidance on protected activity, the Court concludes that Plaintiff's November 18, 2016 email to management complaining of prejudice, bullying, and harassment constituted protected activity. The Court also concludes that Plaintiff's complaint to UCIRO, on the same day, constituted protected activity.

69.     In addition to concluding that Plaintiff participated in protected activity, the Court also concludes that Plaintiff presented sufficient evidence at trial which demonstrated that her employer subjected her to an adverse employment action.

70.     In determining what constitutes an adverse employment action, the Ninth Circuit has instructed that, in the context of a Title VII retaliation claim, an allegedly retaliatory action is subject to challenge so long as the plaintiff can show that the challenged action might have dissuaded a reasonable employee from making or supporting a charge of discrimination. *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1021 (9th Cir. 2018).

71.     In considering this broad interpretation of adverse employment action, the Court concludes that stricter work deadlines, requiring permission to work overtime, and mandating work from a specific onsite location—especially when other nurse practitioners had no such limitations—could dissuade a reasonable worker from making or supporting a charge of discrimination.  This finding is in addition to the fact that Defendant would not allow Plaintiff to transfer to a different position with Step C Final Counseling on her disciplinary record.

72.     While the Court finds that Plaintiff engaged in protected activity by filing complaints of discrimination and harassment and that her employer subjected her to an adverse employment action by implementing a Step C action plan, it also finds that Plaintiff failed to demonstrate a causal link between the protected activity and the adverse action at trial.

73.     In *University of Texas Southwestern Medical Center. v Nassar*, the Supreme Court held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  133 S. Ct. 2517, 2533 (2013).

74.     The Ninth Circuit has observed that causation "may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).  But the plaintiff "must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003).

75.     Other circuit court of appeals have concluded that evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a

1   finding of causation.  *See Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 503 (8th Cir. 2005)

2   (finding a weakened inference of causation when upper management criticized the plaintiff's

3   performance before she complained about her supervisor's conduct); *Erenberg v. Methodist Hosp.*,

4   357 F.3d 787, 793 (8th Cir. 2004) (holding that the plaintiff failed to show a causal connection

5   between her complaints and discharge because she was disciplined for the same performance and

6   attendance problems both before and after she made her complaints).

7          76.     At trial, Plaintiff attempted to provide circumstantial evidence of but-for causation,

8   inviting the Court to infer a causal link between her protected activity and the Step C Final

9   Counseling and action plan through proximity in time and knowledge of her complaints by her

10  supervisor.

11         77.     On November 17, 2016, Plaintiff was notified that her employer would be

12  conducting an investigatory meeting into discrepancies in her attendance and hours of work and

13  concerns with her work performance.  Only after Plaintiff received this notification, did she file

14  complaints outlining harassment and discrimination.  Plaintiff continued to file complaints up to,

15  and after, the date on which she was made aware of the Step C Final Counseling and action plan.

16         78.     The fact that Plaintiff made discrimination and harassment complaints four and

17  one-half months prior to her final counseling, and one day after she was informed that a meeting

18  investigating serious allegations of performance issues would take place, is insufficient evidence

19  of causation in this case.  Additionally, as multiple witnesses testified at trial, Plaintiff's work

20  performance was under scrutiny long before she raised the issue of discrimination to upper

21  management.  In fact, the Court draws the reasonable inference that Plaintiff may have raised the

22  issue of discrimination *because of* her pending disciplinary investigation, and not the reverse.

23

24

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 23

79.     Lastly, Plaintiff failed to present sufficient evidence a trial which demonstrated that management relied on her complaints in its decision to issue final counseling.  While Plaintiff did demonstrate that her supervisor was aware of her November 18, 2016 internal complaint on December 16, 2017, that evidence is insufficient to demonstrate that the complaint was a but-for reason for the final counseling and action plan.  Plaintiff's first investigatory meeting had concluded on December 5, 2016, and management had sufficient information, even then, to administer final counseling.

80.     Even assuming *arguendo* that Plaintiff established a prima facie case of retaliation, Defendant proffered an abundance of evidence at trial that demonstrated legitimate, nondiscriminatory reasons for the final counseling and action plan, and Plaintiff failed to provide sufficient evidence demonstrating that Defendant's reasons were pretextual.

81.     Accordingly, Plaintiff's Title VII retaliation claim fails, and the Court finds in favor of Defendant on this claim.

### D.     Retaliation under the Washington Law Against Discrimination

82.     The WLAD prohibits employers from retaliating against employees who oppose discriminatory practices.  *Cornwell v. Microsoft Corp.*, 430 P.3d 229, 234 (Wash. 2018).  Where the employee lacks direct evidence of discrimination, Washington has adopted the three-step evidentiary burden-shifting framework outlined in *McDonnell Douglas*.  *Mackey v. Home Depot USA, Inc.*, 459 P.3d 371, 381 (Wash. App. Ct. 2020).  First, an employee must make a prima facie case of retaliation by showing that (i) she engaged in a statutorily protected activity, (ii) the employer took an adverse employment action against her, and (iii) there is a causal connection between the employee's activity and the employer's adverse action.  *Id*. at 383.  Second, the burden shifts to the employer, who must articulate a legitimate, nondiscriminatory reason for the adverse

1  employment action.  *Id*. at 381.  Third, if the employer meets this burden, the employee must

2  produce sufficient evidence showing that the employer's alleged nondiscriminatory reason for the

3  adverse action was a pretext.  *Id*. at 382.

4  83.    In analyzing Plaintiff's retaliation claim under the WLAD, the Court concludes

5  that Plaintiff failed to establish a prima facie case, as she failed to demonstrate a causal link

6  between her protected activity and the adverse employment action.

7  84.    In making this determination, the Court finds that Plaintiff proffered sufficient

8  evidence at trial demonstrating that she took statutorily protected action by filing complaints of

9  harassment and discrimination against her supervisor.  In *Mackey v. Home Depot USA, Inc.*, 459

10 P.3d 371 (Wash. App. Ct. 2020), the Washington Court of Appeals reiterated that complaints

11 concerning discriminatory conduct are statutorily protected activity under the WLAD.  *Id*. at 383

12 (citing *Estevez v. Fac. Club of Univ. of Wash.*, 120 P.3d 579 (2005)).

13 85.    The Court also finds that Plaintiff presented sufficient evidence demonstrating that

14 Defendant took an adverse employment action against her by subjecting her to final counseling

15 and a corresponding action plan.  In *Boyd v. State, Department of Social and Health Services*, the

16 Washington Court of Appeals ruled that for an employment action to be considered adverse under

17 the WLAD, the "employee must show that a reasonable employee would have found the

18 challenged action materially adverse, meaning that it would have dissuaded a reasonable worker

19 from making or supporting a charge of discrimination." 349 P.3d 864, 870 (Wash. App. Ct. 2015)

20 (internal quotation marks and citation omitted).  The Washington Supreme Court has added that

21 courts are to "liberally construe the provisions of [the] WLAD."  *Cornwell*, 430 P.3d at 234.

22 86.    In its previous analysis of Plaintiff's Title VII retaliation claim, the Court concluded

23 that "stricter work deadlines, requiring permission to work overtime, and mandating work from a

24

specific onsite location—especially when other nurse practitioners had no such limitations—could dissuade a reasonable worker from making or supporting a charge of discrimination." *See supra* pp. 21-22. Considering guidance from Washington courts outlining a similar standard for adverse employment action under the WLAD, the same conclusion applies here. Plaintiff suffered an adverse employment action which was administered by Defendant.

87.    While Plaintiff was able to proffer sufficient evidence at trial that she engaged in statutorily protected activity and suffered an adverse employment action, she failed to demonstrate a causal link between the protected activity and the adverse employment action.

88.    Under the WLAD, a plaintiff "must prove causation by showing that retaliation was a substantial factor motivating the adverse employment decision." *Boyd*, 349 P.3d at 872. In determining what constitutes a "substantial factor," retaliation need not be the main reason for the employment action. *Mackey*, 459 P.3d at 383. "[T]he employee is required to show only that "a reasonable [fact finder] could find that retaliation was a substantial factor." *Id*. at 383-84 (internal quotation marks and citation omitted). "However, the employee also must show that the employer had knowledge that the employee had engaged in protected activity." *Id*. at 384. "An employee can make this showing either by demonstrating that the employer had actual knowledge of the protected activity or that the employer knew or suspected that an employee had engaged in the protected activity." *Id*.

89.    The Court concludes that retaliation was *not* a substantial factor in Defendant's decision to issue final counseling and a corresponding action plan upon Plaintiff. At trial, Plaintiff was able to demonstrate that her supervisor had actual knowledge that she filed complaints concerning harassment and discrimination on November 18, 2016. However, that evidence, alone,

failed to establish that Plaintiff's November 18, 2016, complaint was a causal factor in management's collective decision to issue final counseling.

90.     Even assuming that Plaintiff established a prima facie case of retaliation under the WLAD, Defendant proffered more than sufficient evidence at trial that demonstrated legitimate, nondiscriminatory reasons for its final counseling and action plan, and Plaintiff failed to provide sufficient evidence demonstrating that Defendant's reasons were pretextual.

91.     Accordingly, Plaintiff's WLAD retaliation claim fails, and the Court finds in favor of Defendant on this claim.

**E.      Failure to Accommodate under the Washington Law Against Discrimination**

92.     Under the WLAD, an employer has an affirmative duty to accommodate an employee's disability unless it would impose an undue hardship on the employer's business. *Frisino v. Seattle Sch. Dist. No. 1*, 249 P.3d 1044, 1049 (Wash. App. Ct. 2011); *Kimbro v. Atl. Richfield Co.*, 889 F.2d 869, 878 (9th Cir. 1989). In order to prove a reasonable accommodation claim, the employee must establish four factors: (i) she suffered from a disability, (ii) she was qualified to do the job, (iii) she gave notice to her employer of her disability, and (iv) the employer failed to adopt reasonable measures to accommodate the disability. *Slack v. Luke*, 370 P.3d 49, 54 (Wash. App. Ct. 2016). "A reasonable accommodation must allow the employee to work in the environment and perform the essential functions of her job without substantially limiting symptoms." *Frisino*, 249 P.3d at 1049. "To accommodate, the employer must affirmatively take steps to help the employee with a disability to continue working at the existing position or attempt to find a position compatible with the limitation." *Id*. "[A]n employer is not required to reassign an employee to a position that is already occupied, create a new position, or eliminate or reassign essential job functions." *Id*.

93.     In analyzing Plaintiff's reasonable accommodation claim, the Court concludes that Plaintiff sufficiently demonstrated that she suffered from a disability, she was qualified to perform the essential functions of the job, she gave notice to her employer of her disability, and the employer failed to reasonably accommodate the disability.

94.     The WLAD defines "disability" as the presence of a sensory, mental, or physical impairment that is medically cognizable or diagnosable; or exists as a record or history; or is perceived to exist whether or not it exists in fact.  Wash. Rev. Code § 49.60.040(7)(a)(i)-(iii) (2020).  A disability exists "whether it is temporary or permanent, common or uncommon, mitigated or unmitigated, or whether or not it limits the ability to work generally or work at a particular job[.]"  *Id*. § 49.60.040(7)(b).

95.     On December 8, 2016, Defendant received a leave certification form from Plaintiff's healthcare provider. The form indicated that Plaintiff was experiencing increased anxiety with panic disorder and that she needed time off to reduce stress.  Plaintiff's provider also stated that she had been treating Plaintiff for her health condition since November 14, 2016.  On January 3, 2017, Defendant received another leave certification form from the same provider which indicated that Plaintiff was suffering from continued anxiety and panic disorder and that she needed to extend her leave of absence by roughly 30 days.

96.     Evidence was also presented at trial which demonstrated that a different healthcare provider had treated Plaintiff for anxiety associated with work stress on April 26, 2017.  The provider noted that the anxiety affected Plaintiff's work, sleep, blood pressure, and quality of life.  The provider stated that Plaintiff required a reduced work schedule of twenty (20) hours per week from July 1, 2017, through September 1, 2017.  Defendant received this information a few days before Plaintiff was scheduled to return to work.

97.     In addition to the conclusion that Plaintiff suffered from a disability, the Court also concludes that Plaintiff was qualified to perform the essential functions of the job in question.  In *Davis v. Microsoft Corp.*, the Washington Supreme Court went into extensive detail as to what constitutes essential job functions under the WLAD.  It concluded:

> The term essential functions means the *fundamental job duties* of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the *marginal* functions of the position. Washington courts have in fact drawn on the federal definition to instruct juries on the meaning of "essential functions." Interpreting the term "essential functions" as "fundamental job duties" is helpful. Properly understood, an "essential function" is a job duty that is fundamental, basic, necessary, and indispensable to filling a particular position, as opposed to a marginal duty divorced from the essence or substance of the job.

70 P.3d 126, 132 (Wash. 2003) (internal citations omitted).

98.     At trial, Plaintiff sufficiently demonstrated that she was qualified to complete the essential functions of the job in question, with modification to her schedule.  Plaintiff could see and evaluate patients, interact with others as needed, and given a reasonable amount of time, complete patient notes.  Plaintiff also presented evidence which permits the Court to draw the reasonable inference that Defendant considered Plaintiff qualified to perform the essential functions of her job, as well.  An email chain regarding justification for Plaintiff's modified schedule demonstrated that at least three members of senior management, who were intimately familiar with Plaintiff's work performance, were involved in creating a revised schedule to meet her accommodation request.  Presumably, Defendant would not have allowed Plaintiff to return to work if it had doubted that she could perform the essential functions of her job.

99.     The Court also concludes that Plaintiff gave notice to her employer of her disability.  Plaintiff presented evidence at trial which demonstrated that her employer received her primary care provider's diagnosis and accommodation request on June 27, 2017, in addition to receiving earlier notifications of her condition as well.

1      100.    Finally, the Court concludes that Plaintiff proved that her employer failed to adopt

2    reasonable measures to accommodate her disability and to engage in an interactive process.

3      101.    At trial, Plaintiff argued that because her employer offered a work schedule that

4    required her to see six (6) patients on Tuesdays, in a 5-hour afternoon clinic, that it failed to

5    reasonably accommodate her disability.  Plaintiff also argued that Defendant should have engaged

6    in an interactive process when it received her initial accommodation request, when she responded

7    to its modified schedule with an offer to see a reduced patient load, and when, after attempting

8    Defendant's modified schedule, she explained that she could not meet its scheduling demands in

9    her condition. In response, Defendant argued that Plaintiff's leave certification form only indicated

10   that she could return to work at 20 hours per week and that it met her request by providing her

11   with a 20-hour schedule.  It also argued that there were two pre-scheduled meetings at which

12   Plaintiff could have raised her scheduling concerns, but that she failed to attend those meetings.

13     102.    In *Frisino v. Seattle School District No. 1*, the Washington Court of Appeals offered

14   guidance to courts handling WLAD reasonable accommodation claims with complex fact patterns.

15   It instructed:

> Generally, the best way for the employer and employee to determine a reasonable
> accommodation is through a flexible, *interactive process*. A reasonable
> accommodation envisions an exchange between employer and employee, where
> each party seeks and shares information to achieve the best match between the
> employee's capabilities and available positions. The employer has a duty to
> determine the nature and extent of the disability, but only after the employee has
> initiated the process by notice. In addition, the employee retains a duty to cooperate
> with the employer's efforts by explaining the disability and the employee's
> qualifications. A good faith exchange of information between parties is required
> whether the employer chooses to transfer the employee to a new position or to
> accommodate the employee in the current position.
> . . . .
>
> *An employer may choose to make only one attempt at accommodation, but it risks
> statutory liability if that attempt is not effective and it cannot show that additional
> efforts are an undue burden*. Whether trial and error is necessary, as part of the

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 30

interactive process, to satisfy the employer's burden depends on the facts of the case. Trial and error is not an undue hardship as a matter of law. However, we do not rule out that, under facts not before us, trial and error may constitute an undue hardship to the employer or pose an unacceptable risk to the employee.
. . . .

An employer must be able to ascertain whether its efforts at accommodation have been effective in order to determine whether more is required to discharge its duty. The employee therefore has a duty to communicate to the employer whether the accommodation was effective. This duty flows from the mutual obligations of the interactive process. To hold otherwise would be inequitable to the employer and would undercut the statute's goal of keeping the employee with the impairment on the job. Further, the employee must communicate this information while the employer still has an opportunity to make further attempts at accommodation.

249 P.3d at 1050-52 (internal citations omitted) (emphasis added).

103.    The evidence presented at trial demonstrated that Plaintiff submitted an accommodation request which indicated that she was having anxiety with panic attacks and elevated blood pressure associated with work stress.  In the request, Plaintiff's provider wrote that Plaintiff could return to work for twenty hours per week for two months, from July 1, 2017, to September 1, 2017.  Upon receipt of the request, Defendant drafted a proposed schedule, which limited Plaintiff's work hours to twenty hours per week and included days where Plaintiff would see as many as six patients per 4-to-5-hour clinic.  Defendant communicated Plaintiff's proposed schedule a few days before Plaintiff was to return to work.  Plaintiff responded to Defendant's proposed schedule, stating that she could not handle working part-time and seeing as many as six patients on a clinic day, which was more than her usual load at the time.  Plaintiff asserted that she could see 3 to 4 patients instead on a heavy clinic day.  Defendant replied stating that Plaintiff's schedule was not up for negotiation, adding the caveat that if Plaintiff ran into challenges in meeting work expectations, she should go to her supervisor to engage in a problem-solving discussion to review workflow, priorities, and strategies.  Plaintiff worked the proposed schedule from July 5, 2017, through July 12, 2017.  On the morning of July 12, 2017, Plaintiff sent an email

1  to the Director of Human Resources stating that she had been struggling with her supervisor

2  changing her schedule, that her new schedule forced her to work two hours longer than anticipated

3  the night before, that she was part-time due to medical issues, and that by overfilling her schedule,

4  her license, health, and patient safety were put in jeopardy.  Plaintiff also reported that her new

5  schedule eliminated the ability to properly prepare for each patient and made it impossible to

6  complete patient notes in a timely manner.  The same day, Plaintiff's therapist sent Defendant a

7  disability accommodation form which indicated that due to Plaintiff's acute anxiety and panic

8  disorder he was recommending that she take an indefinite leave of absence.  On July 18, 2017, the

9  Director responded to Plaintiff's email, indicating that she had determined that the schedule

10 created for Plaintiff was fair and reasonable.  The following day, while on leave, Plaintiff sent a

11 follow-up email to the Director complaining that her revised schedule was created to set her up for

12 failure.  Plaintiff also indicated that she provided scheduling alternatives that would have kept her

13 and her patients safe.  In perpetuation testimony, the Director testified that she replied to Plaintiff's

14 July 19, 2017 correspondence with a phone call explaining that the human resources department

15 had done good work on Plaintiff's behalf, that Ms. O'Donohue was addressing her performance

16 concerns, and that Plaintiff's behavior was not in line with her action plan.  The Director testified

17 that she also encouraged Plaintiff to utilize the services of the University's Complaint Investigation

18 & Resolution Office and the EEOC.  July 12, 2017, was Plaintiff's last full day at work.  She

19 resigned from Harborview on November 27, 2017.

20      104.    In ruling in Plaintiff's favor on this claim, the Court concludes that Defendant failed

21 to adopt reasonable measures to accommodate Plaintiff's disability and to engage in the good faith

22 interactive process outlined by the Washington Appellate Court in *Frisino*.  Defendant also failed

23 to demonstrate that Plaintiff's accommodation requests would have imposed undue hardship on

24

1    its business.  Plaintiff's request that she work a reduced patient caseload while working a 20-hour

2    schedule was both reasonable and necessary to effectively address her disability.  While Defendant

3    offered Plaintiff a revised schedule based upon a literal interpretation of her accommodation

4    request, it failed to fulfill its duty to determine the nature and extent of Plaintiff's disability.

5    Defendant's revised schedule also failed to account for the fact that Plaintiff's condition affected

6    her ability to see the number of patients that other providers were able to evaluate in a given

7    afternoon.  And when Plaintiff informed Defendant that she would be unable to work part-time,

8    with a disability, and see six patients in an afternoon clinic, Defendant responded only that it found

9    her schedule to be "fair and reasonable."  Defendant also failed to engage in an interactive process

10   when Plaintiff complained that she was working beyond her scheduled hours and that her new

11   schedule was not working for her or for her patients.  Instead, Defendant relied on the fact that

12   Plaintiff missed two predetermined meetings and misconstrued Plaintiff's absence as a failure on

13   her part to engage in the interactive accommodation process. The Court is unpersuaded by

14   Defendant's interpretation of the facts.  If it were to accept Defendant's argument, an employer

15   would not be required to investigate an employee's request for accommodation or engage in an

16   interactive process, which would stand in contravention to the purpose of the WLAD.

17       105.    As it concerns damages, the WLAD provides for recovery of "actual damages."

18   *Ellingson v. Spokane Mortg. Co.*, 573 P.2d 389, 394 (Wash. App. Ct. 1978).  "Actual damages can

19   include back pay, front pay, mental anguish, and emotional distress." *Clipse v. Com. Driver Servs.,*

20   *Inc.*, 358 P.3d 464, 475 (Wash. App. Ct. 2015) (internal quotation marks and citation omitted).

21   For damages related to emotional distress, "[t]he plaintiff, once having proved discrimination, is

22   only required to offer proof of actual anguish or emotional distress in order to have those damages

23   included in recoverable costs[.]"  *Dean v. Mun. of Metro. Seattle-Metro*, 708 P.2d 393, 400-01

24

(Wash. 1985)).  "A plaintiff need not present expert testimony as to emotional distress; his or her own testimony can suffice."  *Stewart v. Snohomish Cnty. PUD No. 1*, 262 F. Supp. 3d 1089, 1111 (W.D. Wash. 2017).

106.    The burden of proving damages rests with the party claiming them.  Wash. Pattern Jury Instr. Civ. 330.81 (7th ed. 2019).  At trial, Plaintiff argued that she was seeking "general damages" for what she lost and suffered due to her employment at Harborview, including lawyers' fees, emotional distress, and reputational harm.  Plaintiff failed to argue that she was entitled to front pay or back pay and failed to proffer sufficient evidence for those awards.  Plaintiff left it to the Court to fashion an award and failed to present any specific amount(s) for damages.

107.    At trial, the Court heard testimony from Plaintiff's husband describing the emotional impact of Defendant's failure to accommodate her disability. Plaintiff's husband testified that during the time that Plaintiff was working a reduced schedule, Plaintiff would come home frantic and full of anxiety because she felt that she was intentionally given a full-time workload by management.  He testified he remembered Plaintiff telling him that she thought Defendant was retaliating against her and that she felt things were only going to get worse. Plaintiff's husband also testified that Defendant's treatment of Plaintiff changed the dynamic of their family and that it had been the worst thing in his life as a husband and a father.

108.    The Court also heard testimony from Plaintiff who said that during the time of her accommodation request, she felt that her revised schedule was simply a method of retaliation against her.  She testified that, in her mind, part of the accommodation process was resolving issues before she entered the clinical setting and before those issues negatively impacted her life and the lives of her patients.  She explained that she felt that her new schedule had set her up for failure and was drafted in retaliation for filing discrimination and harassment complaints. Plaintiff

1   testified that the day after she was required to see six patients and stayed two hours past her shift

2   to finish her work, she was beat and could neither focus nor talk.  Plaintiff testified that she was

3   shocked and defeated by her new schedule and that during this time she was suffering.

4         109.   Based on this testimony, the Court finds that Defendant's WLAD reasonable

5   accommodation violation proximately caused Plaintiff emotional harm.  The Court finds that the

6   amount of money that will reasonably compensate Plaintiff for these damages is $20,000.

7         110.   Accordingly, the Court finds in Plaintiff's favor on her reasonable accommodation

8   claim under the WLAD and awards her $20,000 in damages.

## JUDGMENT

10         For the foregoing reasons, the Court finds in Defendant's favor on the disparate treatment

11   and retaliation claims and in Plaintiff's favor on the WLAD reasonable accommodation claim.  On

12   the WLAD claim, the Court awards Plaintiff noneconomic damages in the amount of $20,000.

13   Within 30 days of entry of judgment, Plaintiff may move for recovery of any tax consequences of

14   this award under *Blaney v. International Ass'n of Machinists and Aerospace Workers, Dist. No.*

15   *160*, 87 P.3d 757 (Wash. 2004), as well as an award of pre- and post- judgment interest, as provided

16   in Wash. Rev. Code. § 49.60.030(2).  Both parties may move for recovery of reasonable attorney's

17   fees and costs.  The Clerk of Court is instructed to close this case.

19         Dated this 18th day of February, 2021.

                        Honorable Cindy K. Jorgenson
                        United States District Judge